This appeal follows the circuit court's grant of motions for directed verdict in favor of all defendants, after the presentation of plaintiff's evidence. We affirm.
R.H. Moore, Sr., doing business as Moore's Asphalt Paving Company (Moore), commenced this action on October 13, 1978, against Johnny O'Grady (O'Grady) and Tommy Baker (Baker) based on road work done for them relating to the development of a subdivision. Moore attempted to secure the debt by a "mechanic's lien." The real property described in Moore's lien statement is Sunnydale Estates, the subdivision for which Moore had done the road work. The subdivision consisted of approximately 36 acres. O'Grady owned the ten acres which were subdivided into the first sector of the subdivision, and Baker owned the 26 acres that were subdivided into the second and third sectors of the subdivision. Each owner had individually mortgaged his land, prior to the subdivision thereof, to Merchants and Planters Bank (the Bank), said mortgages being recorded on August 24, 1977. Moore's contract with O'Grady for the construction of the roads and valley gutters was dated August 29, 1977.
After the filing of Moore's suit, Curb Specialists, Inc. (Curb Specialists) filed a mechanic's lien action against O'Grady and Baker, claiming a lien against the subdivision land. After this case was consolidated with Moore's action, Curb Specialists amended its complaint to add Moore as a defendant, claiming that it had subcontracted with Moore to construct the valley gutters specified in Moore's contract with O'Grady.
On March 30, 1979, the Bank foreclosed the O'Grady mortgage, and on March 24, 1980, intervened in Moore's case as the owner of the land against which Moore sought his lien. Thereafter, O'Grady filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Act, staying all proceedings against him. This action continued against Baker and the Bank. After obtaining a release from the Bank's mortgage, Castleberry Construction Company, Inc. (Castleberry) purchased two of the Baker lots and after becoming a party in the lien suits, was granted summary judgment to negate any lien claims against these lots. On June 13, 1980, the Bank foreclosed the Baker mortgage on the remaining property. After severing the lien issues from the other issues in the consolidated cases, the court granted a summary judgment in favor of the Bank, negating the lien claims against all the mortgaged property. The judgments in favor of the Bank and Castleberry were made final pursuant to Rule 54 (b), A.R.C.P., but no appeal was taken.
On August 29, 1980, Moore added the Bank as a party defendant, claiming the breach of an alleged duty owed by the Bank to Moore. The court dismissed this claim on November 4, allowing Moore fourteen days to furnish a more definite statement of any contract claim against the Bank, or any other claim not barred by a statute of limitations. On March 13, 1981, following one unsuccessful attempt at amending the complaint, the court allowed Moore to file an amendment which raised a claim against the Bank for fraud. After several *Page 753 
additional filings, a pretrial conference was held. Afterward, the trial court executed a pretrial order clarifying the claims and defenses. Following the presentation of the plaintiff's evidence at trial, the court directed verdicts in favor of all defendants.
The following issues are raised upon appeal:
 1. As to the plaintiff's quantum meruit claim, or, alternatively, an express contract claim against Baker, was the evidence sufficient to raise a question of fact for the jury?
 2. Is the claim of fraud against the Bank barred from jury consideration by the statute of limitations?
 3. Did the plaintiff present a jury question as to its claim based on an implied contract with the Bank?
We answer the first and third questions in the negative, and the second affirmatively. For the sake of clarity we shall discuss them separately.
 I.
Moore's claim against Baker is based on the theory that Moore had an express contract with Baker, or, alternatively, that Baker, being a joint venturer with O'Grady, was jointly and severally liable for O'Grady's debts relating to the joint venture. The only express contract entered into evidence is clearly between Moore and O'Grady, and Moore, in brief, cites to us no other evidence to indicate an express contract with Baker. Thus, we proceed to Moore's alternate theory, that of the existence of a joint venture.
The burden of establishing the existence of a joint venture is upon the party asserting that the relation exists. 46 Am.Jur.2d, Joint Ventures, § 69 (1969). The elements of a joint venture have been held to be: a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; a joint property interest in the subject matter of the venture and a right to mutual control or management of the enterprise; expectation of profits; a right to participate in the profits; and usually, a limitation of the objective to a single undertaking or ad hoc enterprise. While every element is not necessarily present in every case, it is generally agreed that in order to constitute a joint venture, there must be a community of interest and a right to joint control. 46 Am.Jur.2d Joint Ventures, § 12 (1969). Thus, in order to avoid a directed verdict on this issue, Moore must show evidence supporting the existence of these two elements. In judging the sufficiency of the evidence in ruling on a directed verdict, the scintilla rule must be applied. Rule 50, A.R.C.P., Committee Comments. Casey v. Jones, 410 So.2d 5 (Ala. 1981). However, this court has stated:
 We recognize that the scintilla rule prevails in this state, but this does not at all conflict with the equally well-known rule that a conclusion as to liability which rests upon speculation pure and simple is not the proper basis for a verdict. Rota v. Combs, 267 Ala. 50, 99 So.2d 692; Continental Casualty Co. v. Paul, 209 Ala. 166, 95 So. 814, 30 A.L.R. 802. Evidence which affords nothing more than mere speculation, conjecture, or guess is wholly insufficient to warrant the submission of a case to the jury. Williams v. Palmer, 277 Ala. 188, 168 So.2d 220, and cases there cited.
Headrick v. United Insurance Company of America, 279 Ala. 82,181 So.2d 896 (1966).
Moore relies heavily upon a subdivision plan which contains a notation showing O'Grady and Baker as developers. We do not consider this, of itself, an indication of a community of interest as required in a joint venture. (See, e.g., Christiev. Dyer, 205 Ala. 572, 88 So. 668 [1921]). It is clear from the plaintiff's evidence that O'Grady's ten acres and Baker's 26 acres remained individually owned, and each owner arranged his own loan for the project, and mortgaged his own property. The moneys received from the loans were kept in separate accounts. The evidence shows that one lot was sold from O'Grady's section of the subdivision before the lawsuits began, from which sale O'Grady received the entire benefit *Page 754 
and Baker received nothing. Likewise, we find no evidence of a joint right of control. The evidence presented by Moore shows that Moore contracted with O'Grady, that he knew of O'Grady's reputation as a general contractor, and that he relied on him as such. Moore submitted bills to O'Grady, and looked to him for payment. Baker made no attempt to supervise the work on the subdivision in any way. Baker's only duty was to review invoices submitted to him by O'Grady, and approve them. Then O'Grady took them to the Bank and was paid the amounts listed on the invoices. From the plaintiff's evidence, the relationship between O'Grady and Baker was clearly one of general contractor and owner, rather than that of two joint venturers. Thus, we find that Moore failed to carry his burden of proof, and the trial court did not err in granting Baker's motion for a directed verdict.
 II.
Moore's fraud claim against the Bank is based upon a conversation that took place in March 1978, between Moore and Mr. Kelly, the president of the Bank. Moore had gone to the Bank with Baker, who introduced him to Mr. Kelly. The evidence indicates that Moore asked Mr. Kelly for a payment on his contract, although the job was not finished. On direct examination Moore testified:
 A. [A]nd he said, when the job is completed, said bring the bill and I'd — said no — when the job is completed bring the bill and I will see that you get your money.
 Q. Did [Mr. Kelly] tell you how much money he had at that particular time in any account?
A. No, sir, he didn't.
 Q. Did he tell you there was an account there at the bank for the construction of this subdivision — did he or Mr. Baker, either one, tell you that there was an account there for that purpose?
 A. Yes, sir. He said we are not going to put out any more money until the job is completed.
Q. He didn't tell you how much money he had?
A. No, sir, he didn't.
Moore did not testify that Baker asked Mr. Kelly to make a payment to Moore, nor that either Baker or Moore asked Mr. Kelly how much money was in the construction loan account at that time.
On March 13, 1981, Moore stated a fraud claim against the Bank. Moore does not argue that his claim relates back to the filing of his original action in 1978, or to any amendments prior to March, 1981. Rather, he contends that his claim is timely under Code 1975, § 6-2-3, which states:
 In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have one year within which to prosecute his action.
This court has held:
 The "fact constituting the fraud" is deemed to have been discovered when it ought to have been discovered; that is, at the time of the discovery of facts which would provoke inquiry by a person of ordinary prudence and which, if followed up, would have led to the discovery of the fraud. See Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389, 281 So.2d 636 (1973).
Papastefan v. B L Construction Co., Inc., 385 So.2d 966 (Ala. 1980). Where the statute of limitations is raised as a defense in such a case, it is "incumbent upon plaintiff to prove that [his] cause of action accrued within the period of the bar."Papastefan, supra at 967. From the record, we have found not a scintilla of evidence that Moore discovered the alleged fraud within one year prior to March 13, 1981. It is somewhat unclear from the record whether Moore was relying on a theory of misrepresentation by the Bank upon which he acted (Code 1975, §6-5-101), or suppression of a *Page 755 
material fact which the Bank was under an obligation to communicate to Moore (Code 1975, § 6-5-102). However, either way the outcome is the same. If Moore is claiming that the Bank misrepresented that he would be paid when he finished the job, and he finished, relying on that claim, then it is clear that he had knowledge of the alleged misrepresentation in July, 1978, when the job was finished and payment was not forthcoming.
Moore argues, however, that the fraud consisted in the Bank's failure, under duty, to tell him in March, 1978, that there was not enough money in the construction account to pay Moore. Moore further argues that the court refused to allow him to present evidence that would indicate that he first learned on March 26, 1981, that the Bank had known at the time of the March, 1978 conversation that the funds in the account were insufficient to cover the amount of Moore's contract. As this date is after the filing of the fraud claim, we must conclude that something else put Moore on notice that a fraud might exist, and the trial court was correct in failing to admit that as evidence of the beginning of the running of the statute of limitations. It appears from the record that at the time of the Bank's foreclosure on the property, March 1979, Moore had had a further conversation with Mr. Kelly, during which he learned that the mortgages on O'Grady's and Baker's properties had been primarily for the purpose of securing old debts, and that the money put aside for construction purposes had been considerably less than Moore had believed. While he did not specifically learn on that day that the amount in the construction account in March, 1978, was less than one-fourth of the amount of his contract, he certainly had notice "which would provoke inquiry by a person of ordinary prudence and which, if followed up, would have led to the discovery of the fraud." Papastefan,supra. At any rate, there is no evidence of any other event at a later date which could have led to Moore's filing the fraud claim on March 13, 1981; therefore, we hold that such claim is barred by the statute of limitations.
 III.
Moore's final claim on appeal is that Mr. Kelly's instruction, "When the job is completed bring the bill and I will see that you get your money," amounted to an implied contract that the Bank itself would pay Moore if he were not paid from other sources on completion of the job. Both Moore and the Bank rely on the authority of Gilbert v. Gwin-McCollumFuneral Home, 268 Ala. 372, 106 So.2d 646 (1958), in which this court stated:
 An implied contract arises where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract. Such a contract must contain all the elements of an express contract, which rests on consent, and it is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. 17 C.J.S. Contracts § 4, subd. b; Cowan v. Martin Huckaby, 246 Ala. 378, 20 So.2d 769. And the only difference in an implied contract and an expressed contract is in the mode of proof, the elements being the same. American Mutual Liability Ins. Co. v. McDiarmid, 211 Ala. 127, 99 So. 849.
Gilbert, supra, 268 Ala., at 379, 106 So.2d, at 653.
There is nothing in the evidence to show that the Bank intended to assume the obligation of O'Grady's contract with Moore, should O'Grady fail to meet that obligation. Nor is there any evidence to show that Moore looked, from that moment on, to the Bank as the source of his payment. Moore calls our attention to his testimony:
 Q. Did you have an intention to finish that work when you went to the bank there if you didn't get your money?
 A. I had told Mr. Baker I didn't get some money on this job, I am shutting her off until I get some. When we went to the bank, Mr. Kelly said when you complete the work, give me the bill and I will see that you get your money.
Q. Did you rely on Mr. Kelly? *Page 756 
 A. Yes, I would have pulled off of it that day. I wouldn't have put any more money into it if he had said we haven't got the money. . . .
While this testimony certainly indicates Moore's intention to breach his contract with O'Grady if he did not receive some money, there is nothing to indicate that the Bank knew of his intention, or of Moore's alleged reliance on the Bank for payment as a basis for continuing the construction work. The evidence shows that Moore, at the March 1978 meeting, showed Mr. Kelly his contract with O'Grady and allowed him to make a copy of it for the Bank's file, indicating that Moore was looking to O'Grady for fulfillment of an express contract. A mere statement by Moore that he would have abandoned the job had not the Bank asserted that he would be paid at the completion thereof, which assertion by the Bank was in accord with Moore's express contract with O'Grady, in no way approaches the showing of the elements of a contract, either express or implied, between Moore and the Bank. For all of the above reasons the trial court's order of a directed verdict is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, ALMON and EMBRY, JJ., concur.