STUART, Justice.
George E. Russell and Thomas E. Russell, as coexecutors and cotrustees of the will and testamentary trust of Earnest W. Russell, and Myrtis Russell (“the Rus-sells”), and Price McLemore, Mary H. McLemore, John Mclnnis, Jr., Timothy N. Mclnnis, Charles R. Mclnnis, Williams S. Newell, and the Peoples Bank and Trust Company, as trustee for the Adaline Hooper Trust A and B (“the McLemore group”), sued the Industrial Development Board of the City of Montgomery (“the IDB”) and Hyundai Motor Manufacturing Alabama, LLC (“Hyundai”), alleging breach of contract. Specifically, they alleged that the IDB, on behalf of Hyundai, exercised options to purchase their real property but failed to pay them in accordance with the most-favored-nation clause in the option agreements the same price per acre that was paid to another landowner. The trial court entered summary judgments for the IDB and Hyundai. We affirm in part, reverse in part, and remand.

*322
Facts

In September 2001, various officials of the State of Alabama, the City of Montgomery (“the City”), the Montgomery County Commission (“the County”), the Montgomery Area Chamber of Commerce, and the Montgomery Water Works Board began making preparations to secure options to purchase property in the Montgomery area to create an incentive package in the hope that they could persuade Hyundai to build an industrial plant in the Montgomery area for the purpose of manufacturing and assembling motor vehicles. This intent is evidenced by a signed letter to Hyundai from the City, the County, and the IDB stating that they, “in partnership with the State,” would commit to providing an industrial site to Hyundai at no cost. Although the funds to purchase the property were to be provided by the City and the County only, the option agreements on the property were acquired by the IDB, whose primary role in industrial projects is to “serve as the entity through which monies flow for the purchase of land for the ultimate use in industry.” [1] B.M. Ahn, the Hyundai representative in charge of Hyundai’s project to open a plant in the United States, testified during his deposition that one of the basic elements of an incentive package is “free land” offered to an automobile company as part of the incentive for the company to locate in a certain area. Ahn stated that Hyundai had no role in acquiring the options on the land.
The Russells owned approximately 328 acres of land in Montgomery County. In the fall of 2001, Reuben Thornton, the chairman of the IDB, entered into an option agreement on behalf of the IDB to purchase the Russells’ property for an industrial project.[2] The agreement provided an option period of 120 days and stated:
“3. If Purchaser elects to exercise this Option the purchase price for the Property shall be determined as follows:
“Seller and Purchaser shall each, at its own cost and expense, secure a current appraisal of the Property. The purchase price shall be the average of the two appraisals provided, however, in no event shall the purchase price be less than $4,500 per acre and further provided that the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property. The acreage shall be determined by a good and accurate survey provided by Purchaser.[3]
[[Image here]]
“16. This Option constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Option and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.”
*323 The Russells and the IDB amended the option agreement in February 2002 to provide:
“1. It is hereby agreed that the purchase price for the Property is Four Thousand Five Hundred and No/100 Dollars ($4,500.00) per acre. The exact number of acres to be determined by the survey provided by Purchaser.
“2. The option period is hereby extended for a period of 120 days from the Effective Date of the Option, which Effective Date is October 3, 2001. The expiration date of the Option, as extended, is now May 31, 2002.
“3. Except as amended hereby, the Option is in all other respects ratified and confirmed.”
In February 2002, Thornton, on behalf of the IDB, entered into an option agreement with the McLemore group, who owned approximately 54 acres of land near the Russell property. The terms in the option agreement with the McLemore group are identical to the terms in the original option agreement between the Russells and the IDB.
The IDB also acquired four additional option agreements with landowners near the property belonging to the Russells and the McLemore group. During the acquisition process, the IDB approached Joy Shelton about an option to purchase her property; however, she refused to enter into an option agreement. The IDB decided that the Shelton property[4] was not necessary for the incentive package. By mid-March 2002, the IDB determined that it was not going to designate any additional funds, other than the funds already committed, to this particular project. The State and the IDB sent the incentive package, including the proposed project site, to Hyundai for consideration.
On March 28, 2002, Ahn contacted Todd Strange, then the director of the Alabama Development Office. He stated that Hyundai had not decided whether to locate the plant in Montgomery or in Kentucky but that additional property would need to be acquired for the rail access Hyundai required if Montgomery was to be selected as the site for the Hyundai plant. Ahn informed Strange that he would need an answer by noon of the next day as to whether the property could be acquired. Strange met with various State, City, and County officials to discuss Hyundai’s request. Recognizing that the City and the County would not provide additional funds to acquire more property and that the other option agreements contained most-favored-nation clauses, they decided to ask CSX Transportation, Inc., the rail company, to acquire the option to purchase the Shelton property. On March 29, 2002, Strange sent David Hemphill, an assistant vice president for CSX, the following letter via facsimile:
“Last evening, Thursday, March 28, 2002, at 6:05 p.m. Central Standard Time, I received a call from Mr. B.M. Ahn, President Hyundai Motor Company, U.S. from Seoul, Korea. He told me they were in the final stages of the decision and needed to make modifications to their Montgomery site layout because the CSX Railroad yard estimate had come in extremely high. In their (Hyundai’s) redesign, he wanted to do parallel tracks running north and south on the eastern side of the property boundary. His engineers told him he would not have enough room unless [additional property was] obtained in the *324 southeast corner of the quadrant. This property had been discussed a couple of months ago but we had been told as recently as two weeks ago that it would not be necessary. So accordingly, we did not pursue any options....
“As I indicated to you last night, our option agreements have a ‘most favored nation’ clause where we agreed to pay no more for any one parcel than any of the other parcels. Accordingly, I assembled a working group of the local Chamber of Commerce executives, engineering expertise, Dave Echols[5] and myself. We decided the most appropriate course to follow would be to ask CSX to obtain a parcel for rail access to keep it outside the project agreement. As you know CSX’s agreement with Hyundai is separate and this property in their view is for rail access only....
[[Image here]]
“Dave, as you can appreciate there are a lot of details to be worked out, but the spirit and concept is for CSX to obtain the needed parcel for rail access and whatever the purchase price, CSX would be made whole in a manner we mutually agreed upon.”
Also on March 29, 2002, Hemphill sent the following e-mail to Dave Echols:
“Regarding the [Shelton property] that will need to be purchased, you asked if CSX would be willing to buy this property for the State and Montgomery at approximately $8,000.00 an acre. There is no contract or option on the property currently and you estimate it will cost us approximately $750,000.00 which you are willing to refund to us in some fashion during the track construction phase. Randy Evans,[6] in principle agreed to this and I ask that you fax us a letter outlining exactly what you have in mind. The purpose of doing it this way rather than what you did in getting control of the other 1600 acres is to avoid paying the other landowners $8,000.00 an acre which would have a negative impact of $10,000,000.00 on the site cost. The railroad does not get good land values in a situation like this and so I think there will be upward pressure on that $8,000 number. Moreover, the other landowners will get wind of this ploy and may create negative community publicity. ... In your letter to us we would ask that you indicate exactly how you intend to pay us during the track work construction.”
Mayor Bobby Bright, mayor of the City of Montgomery and an ex officio member of the IDB, was selected as the main representative to meet with Shelton to acquire an assignable option agreement designating the City as the purchaser of the Shelton property. Before Bright agreed to meet with Shelton, he told Strange and other State officials that the City and the County would not provide any additional money toward the project. They assured him that the City and the County would not be asked or expected to contribute any funds toward the purchase of the Shelton property and that the option would be assigned to either CSX or the State. Randy George, president of the Montgomery Area Chamber of Commerce and secretary of the IDB, and Elaine McNair, a member of the Chamber of Commerce, went with Bright to meet with Shelton. Bright obtained an assignable option, designating the City, not the IDB, as the purchaser of the property; the purchase price of the property was $12,000 per acre.
*325 McNair informed Thomas H. Gallion III, the IDB’s attorney, of the acquisition of the option to purchase the Shelton property. During her deposition, she stated:
“On Friday when ... I came back from visiting with Mrs. Shelton, I contacted both Mr. Gallion and Mr. McPhillips.[7] My concern was, ... just to let them know what had happened, you know, with Thursday night because it happened so fast. They were not aware of it until after the fact, so I wanted to tell them what had happened.
“But also I was just a little concerned with [Mayor Bright] taking out the option — because he was a local person, and his action of just taking out the option which would be assigned to CSX or somebody, that just made me a little nervous.
“So I just said — you know, I was, you know, just calling them just to be sure that that wouldn’t trigger any — you know, we just didn’t know whether or not that would, and so I just wanted to be sure. So I contacted both of them.”
On April 1, 2002, Hyundai announced that it was going to build the plant in Montgomery. On April 15, 2002, the various State and local governmental entities involved, including the IDB, entered into a project agreement with Hyundai detailing the location and development of the plant (“the project agreement”). The project agreement, in section 3.1 of Article 3, stated that “the Montgomery IDB presently holds purchase options necessary to acquire fee simple title to each parcel of real estate comprising the Project Site.” The project agreement further provided in section 3.4 that the IDB was to exercise each option and in section 3.6(a) that the IDB was then to transfer title of the property to Hyundai. Section 3.20 of the project agreement, entitled “CSX Agreement,” provided separately for the acquisition of the Shelton property, stating:
“The State and Local Governments shall use their best efforts to cause CSX Transportation to enter into an agreement with [Hyundai] in form satisfactory to [Hyundai], which will provide for rail service for [Hyundai] on terms and conditions as favorable to [Hyundai] as those offered to other automobile manufacturers. In addition, the State and City shall use their best efforts to cause CSX Transportation to provide the incentives set forth in the letter from CSX Transportation dated December 17, 2001. The State represents and warrants that [Hyundai] will acquire fee simple title to [the Shelton property] for use in connection with construction of a rail switch yard by or before September 30, 2002. If and to the extent [Hyundai] makes any payment for the cost of acquiring such acreage, the State shall reimburse [Hyundai] for such costs by increasing by an equivalent amount the monies made available from the State in Training Equipment Fund pursuant to Article 4 by no later than the last quarter of the calendar year 2003. The City agrees that it will zone such additional acreage the same as the Project Site. The Local Governments agree to abate taxes that are applicable to such additional acreage in the same manner and to the same extent as ... abatement of taxes of the Project Site.”
The IDB assigned the options on the property owned by the Russells and the McLemore group to the City and the County. On May 14, 2002, the City and the County purchased the property for $4,500 per acre. The City and the County then deeded the property to the IDB, *326 which then deeded the property to Hyundai.
The City never exercised its option on the Shelton property. On May 22, 2002, Henry Mabry, then director of finance for the State, sent Ahn a letter confirming that the State would be funding the purchase of the Shelton property, stating:
“This is to confirm that the State of Alabama will provide the funding for the purchase of the 93 acres set aside for Hyundai’s rail yard on the date of closing. This will obviate any need for Hyundai to borrow to pay for this acquisition. In addition, the State will pay the reasonable due diligence costs incurred in connection with Hyundai’s acquisition of this property. This letter of assurance is being provided to you pursuant to Section 3.20 of the Project Agreement.”
On May 31, 2002, the day the option agreement on the Shelton property was to expire, CSX entered into a real-estate sales contract for the purchase of the property at $12,000 per acre. When Hyundai learned that CSX, and not the State, was to pay for the rail installation and that Hyundai would be expected to enter into a long-term contract with CSX, Hyundai decided to install the rail using its own funds. As a result of Hyundai’s decision not to involve CSX in rail installation, CSX assigned the real-estate contract to Hyundai. According to the assignment contract, CSX assigned the contract to Hyundai on May 28, 2002, three days before the real-estate contract between CSX and Shelton was executed. On July 12, 2002, funds from the State of Alabama Incentives Finance Authority were transferred to Hyundai to pay for the Shelton property, and Hyundai purchased the property.
After all the land was acquired and deeded to Hyundai, Hyundai leased all the property, including the Shelton property, to the IDB so that the Alabama Department of Transportation (“ALDOT”) could perform site preparation on the property.[8] Additionally, the IDB entered into a tax-abatement agreement with Hyundai so that Hyundai’s property could receive the previously agreed upon abatement from ad valorem taxation and other tax incentives. The Shelton property was included in the tax-abatement agreement.
Subsequently, the Russells and the McLemore group each filed a breach-of-contract action against the IDB and Hyundai, alleging that the IDB and Hyundai had breached the most-favored-nation clause in the option agreements by not paying them $12,000 per acre for their property. According to the Russells and the McLemore group, the Shelton property was “included in the project agreement” and, consequently, they should have been paid, as Shelton was paid, $12,000 per acre for their property. After some discovery, the IDB and Hyundai moved for summary judgments. The trial court denied the motions. Additional discovery was conducted, and a special master was appointed. The IDB and Hyundai filed renewed motions for a summary judgment. The special master heard oral arguments on the motions and then recommended to the trial court that the motions for a summary judgment be granted. The trial court, after considering the special master’s recommendation, entered summary judgments for the IDB and Hyundai. The Russells and the McLemore group appealed. We *327 have consolidated the appeals for the purpose of writing one opinion.

Standard of Review

“ ‘On appeal, this Court reviews a summary judgment de novo.’ DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So.2d 454, 459 (Ala.2008) (citing Ex parte Essary, 992 So.2d 5, 8 (Ala.2007)). In order to uphold a summary judgment, we must determine that ‘there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.’ Rule 56(c)(3), Ala. R. Civ. P. ‘When the movant makes a prima facie showing that those two conditions have been satisfied, the burden then shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact.’ Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952 (Ala.2004). Substantial evidence is ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see also § 12-21-12(d), Ala. Code 1975. In reviewing a summary judgment, we must view the evidence in the light most favorable to the nonmov-ant. Johnny Ray Sports, Inc. v. Wachovia Bank, 982 So.2d 1067, 1071 (Ala.2007). ‘Finally, this Court does not afford any presumption of correctness to the trial court’s ruling on questions of law or its conclusion as to the appropriate legal standard to be applied.’ DiBiasi, 988 So.2d at 459.”
Catrett v. Baldwin County Elec. Membership Corp., 996 So.2d 196, 200 (Ala.2008). Questions of law are reviewed de novo. Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330 (Ala.2006).

Issues

As we analyze the issues presented by the parties, we are mindful of the following:
“When a trial court is [faced] with a contract issue, it is important for the trial court to determine as soon as practicable the ‘threshold issue’ whether the contract is ambiguous. If the trial court determines that there is no ambiguity, it must ‘ “determine the force and effect of the terms of the contract as a matter of law.” ’ Cherokee Farms, Inc. [v. Fireman’s Fund Ins. Co.], 526 So.2d [871,] 873 [ (Ala.1988) ], quoting Wigington v. Hill-Soberg Co., 396 So.2d 97, 98 (Ala.1981). However, if the trial court finds the contract to be ambiguous, it ‘must employ established rules of contract construction to resolve the ambiguity.’ Voyager Life Ins. Co. v. Whitson, 703 So.2d 944, 948 (Ala.1997): If the application of such rules is not sufficient to resolve the ambiguity, factual issues arise:
“ ‘If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.’
“Id. at 949. Where factual issues arise, the resolution of the ambiguity becomes a task for the jury. McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853 (Ala.1991).”
Alfa Life Ins. Corp. v. Johnson, 822 So.2d 400, 404-05 (Ala.2001).
“ ‘ “Whether a contract is ambiguous is a question of law for the trial court to determine.” P & S Business, Inc. v. South Central Bell Tel. Co., 466 So.2d 928, 931 (Ala.1985) (citing Haddox v. First Alabama Bank of Mont *328 gomery, 449 So.2d 1226, 1228 (Ala.1984); Food Service Distributors, Inc. v. Barber, 429 So.2d 1025, 1028 (Ala.1983)). In interpreting a contract, the “ ‘words of the agreement will be given their ordinary meaning.’ ” Hibbett Sporting Goods, Inc. v. Biernbaum, 391 So.2d 1027, 1029 (Ala.1980) (quoting Flowers v. Flowers, 334 So.2d 856, 857 (Ala.1976)). An “instrument is unambiguous if only one reasonable meaning clearly emerges.” Vainrib v. Downey, 565 So.2d 647, 648 (Ala.Civ.App.1990); see also Flowers, 334 So.2d at 857. “If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may be decided by a summary judgment. However, if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury.” McDonald v. U.S. Die Casting & Development Co., 585 So.2d 853, 855 (Ala.1991) (citations omitted).’
“Reeves Cedarhurst Dev. Corp. v. First Amfed Corp., 607 So.2d 184, 186 (Ala. 1992).”
Ex parte Gardner, 822 So.2d 1211, 1217 (Ala.2001).
Moreover, “just because the parties allege different constructions of an agreement, it does not necessarily mean that the agreement is ambiguous.” Yu v. Stephens, 591 So.2d 858, 859-60 (Ala.1991).

I. Whether the trial court eired in entering a summary judgment for Hyundai

The Russells and the McLemore group contend that the trial court erred in entering a summary judgment for Hyundai because, they say, the IDB, the City, the County, and the State were acting as agents of Hyundai or were involved in a joint venture with Hyundai to acquire the land for the project site; thei'efore, they maintain, Hyundai is also liable for the alleged breach of the contract.

A. Were the IDB, the City, the County, and the State acting as agents of Hyundai in acquiring the property of the Russells and the McLemore group?

“When a defendant’s liability is to be based on agency, agency may not be presumed; rather, when on a motion for summary judgment a defendant has made a prima facie showing that there was no agency relationship, the party asserting agency has the burden of presenting substantial evidence of the alleged agency.” Malmberg v. American Honda Motor Co., 644 So.2d 888, 890 (Ala.1994).
“The authority of an agent to contract on behalf of a principal must be either expressed, implied or apparent. 2A C.J.S. Agency. ... It is stated in 2A C.J.S. Agency § 153 as follows:
“ ‘Implied authority may be viewed as actual authority given implicitly by the principal to the agent; and, as otherwise stated, it is actual authority circumstantially proved, or evidenced by conduct or inferred from course of dealing between the alleged principal and agent. It differs from apparent authority in that it is authority which the principal intended that the agent should have. ... Implied powers, like any others, must be bottomed on some act or acquiescence of the principal, express or implied. They are created by act of the parties and in every case depend largely upon the particular circumstances involved.
“ ‘They are not to be extended beyond the legitimate scope of implied authority, their existence or non-existence in any particular instance being always *329 determinable by reference to the intention of the parties. So an agent has no implied authority unless he believes that he had such authority.
[[Image here]]
“... The doctrine of apparent authority rests upon the principle of estoppel, which forbids one by his acts to give an agent an appearance of authority which he does not have and to benefit from such misleading conduct to the detriment of one who has acted in reliance upon such appearance. We find in Am. Jur.2d, Agency, § 74, p. 476 the following:
“ ‘The apparent power of an agent is to be determined by the acts of the principal, and not the acts of the agent; a principal is responsible for the acts of the agent only where the principal by his acts or conduct has clothed the agent with the appearance of authority and not where the agent’s own conduct and statements have created apparent authority.’ ”
Patterson v. Page Aircraft Maint., Inc., 51 Ala.App. 122, 125-26, 283 So.2d 433, 436 (Ala.Civ.App.1973) (emphasis omitted).
To avoid a summary judgment, a party relying on apparent agency must
“ ‘ “show that he was misled by the appearances relied upon. It is not enough that he might have been, ... so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough.” ’ ”
Brown v. St. Vincent’s Hosp., 899 So.2d 227, 241 (Ala.2004) (quoting Union Oil Co. of California v. Crane, 288 Ala. 173, 180, 258 So.2d 882, 887 (1972), quoting in turn Birmingham News Co. v. Birmingham Printing Co., 209 Ala. 403, 405, 96 So. 336, 339 (1923)).
The Russells and the McLemore group did not present substantial evidence indicating that the IDB, the City, the County, or the State were acting as Hyundai’s express, implied, or apparent agent with regard to the acquisition of their property. The option agreements do not state that the IDB or Thornton, the chairman of the IDB, was acting as an agent of Hyundai; therefore, there is no evidence of express agency. Additionally, we find no evidence of implied agency. Nothing before us creates an inference that Hyundai participated in identifying the location of the property proposed for the project site, that it was involved in drafting the option agreements, that it met with the property owners, or that it was a party to the option agreements. Therefore, the Russells and the McLemore group did not present substantial evidence of express or implied agency. Likewise, the Russells and the McLemore group did not present substantial evidence of apparent agency. The evidence indicates that Hyundai was never involved in selecting the properties for acquisition, that it did not participate in any of the negotiations for the option agreements, and that no Hyundai representative was ever present or communicated with any property owner. Indeed, Thornton testified that the IDB’s purpose in obtaining the option agreements was to “acquire land on behalf of the City and County” in order to “serve the City of Montgomery and promote industry.” Thus, the evidence indicates that the IDB, the City, the County, and the State were not acting to acquire the properties as an agent or under the direction of Hyundai, but at their own direction and on their own initiative to entice Hyundai to build an automobile plant in Montgomery County.
The Russells and the McLemore group urge that evidence of an agency relationship is found in the project agreement. They direct this Court to a provision in the *330 project agreement that required the IDB to exercise the option agreements, to unify the title of the property constituting the project site for transfer of the title of the property to Hyundai, to transfer title of the property to Hyundai, and to perform the site preparation for the property to Hyundai’s specifications. Additionally, they point out that the option agreements were not exercised until after the project agreement was signed.
The project agreement, however, does not evidence an agency relationship. The option agreements were acquired before the IDB, the City, the County, and the State had a relationship with Hyundai. The testimony indicates that they were executed as part of the creation of an incentive package to encourage Hyundai to select the Montgomery area as the site for its automobile plant, and the project agreement is evidence of Hyundai’s acceptance of the package. As Ahn testified, the reason for the project agreement and its requirements was to allow Hyundai to obtain control over the property. Moreover, nothing in the project agreement indicates that Hyundai selected the location for the project or that it was bound by the option agreements or the sales agreements for the property. Thus, the project agreement does not provide substantial evidence of the existence of an agency relationship.
A review of the record does not yield substantial evidence indicating that the IDB, the City, the County, or the State was acting as an agent of Hyundai in acquiring the property of the Russells and the McLemore group.

B. Were Hyundai, the IDB, the City, the County, and the State engaged in a joint venture to acquire the property of the Russells and the McLemore group?

The Russells and the McLemore group contend, in the alternative, that Hyundai is liable for breach of contract because, they say, Hyundai was engaged in a joint venture with the IDB, the City, the County, and the State to acquire their property. According to the Russells and the McLemore group, they presented substantial evidence of the existence of a joint venture through the language in the project agreement indicating a sharing of efforts, property, skill, money, and knowledge to purchase and develop property for a manufacturing plant for a community of interest.
“ ‘This Court wrote in Arndt v. City of Birmingham, 547 So.2d 397 (Ala.1989):
“ 1 “ ‘A joint venture is an association of persons with intent, by way of express or implied contract,' to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each participant shall stand in the relation of principal as well as agent as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the venture.’
“ ‘ “46 Am.Jur.2d Joint Ventures § 1 (1969). As we stated in Moore v. Merchants & Planters Bank, 434 So.2d 751, 753 (Ala.1983), ‘while every element is not necessarily present in every case, it is generally agreed that in order to constitute a joint venture, there must be a community of interest and a right to *331 joint control.’ (Emphasis added [in Arndt ].)
“ ‘ “What constitutes a joint venture is a question of law, but whether a joint venture exists has been held to be a question of fact for the jury. 46 Am.Jur.2d Joint Ventures § 7 (1969). Unless the trial court can say that the parties were or were not engaged in a joint venture as a matter of law, the question must be presented to the jury. As between the parties themselves, the relationship of joint venturers is a matter of intent. As to third persons, it is generally the rule that the legal rather than the actual intent of the parties controls. 46 Am. Jur.2d Joint Ventures § 9 (1969). ‘The burden of establishing the existence of a joint venture is upon the party asserting that the relation exists.’ Moore v. Merchants & Planters Bank, 434 So.2d 751, 753 (Ala.1983); Kim v. Chamberlain, 504 So.2d 1213 (Ala.Civ.App.1987).”
“ ‘547 So.2d at 399-400; see Moore v. Merchants & Planters Bank, 434 So.2d 751, 753 (Ala.1983).’
“Environmental WasteControl, Inc. v. Browning-Ferris Indus., Inc., 657 So.2d 885, 887-88 (Ala.1995).
“‘The elements of a joint venture have been held to be: a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; a joint property interest in the subject matter of the venture and a right to mutual control or management of the enterprise; expectation of profits; a right to participate in the profits; and usually, a limitation of the objective to a single undertaking or ad hoc enterprise. While every element is not necessarily present in every case, it is generally agreed that in order to constitute a joint venture, there must be a community of interest and a right to joint control.’
“Moore v. Merchants & Planters Bank, 434 So.2d 751, 753 (Ala.1983) (citing 46 Am.Jur.2d Joint Ventures § 12 (1969)).”
Flowers v. Pope, 937 So.2d 61, 65-66 (Ala.2006).
The record does not contain substantial evidence to create a jury question with regard to the existence of a joint venture involving Hyundai. Nothing in the evidence supports a finding of a community of interest. Hyundai never had a joint ownership interest with any of the alleged joint venturers in the property of the Rus-sells or the McLemore group upon the closings on the property. Additionally, Hyundai did not provide financing for the purchase of the property, and it had no risk or expenses with regard to the purchase. Thus, nothing supports a finding of a community of interest involving Hyundai with regard to the acquisition of the property to constitute the project site. Cf. Flowers v. Pope, 937 So.2d at 68 (holding that there was no community of interest because the alleged joint venturers did not have an equal proprietary interest and only one of the alleged joint venturers bore the risks and paid the expenses).
Moreover, the record indicates that Hyundai did not have a right of control with regard to how the property was obtained. Nothing indicates that Hyundai controlled the actions of the IDB or other governmental entities with regard to the selection of the property for the project site, the negotiation of the option agreements on the property, or the drafting of the option agreements. Thus, substantial evidence of right of control by Hyundai is not presented in the record.
Although the evidence does tend to establish that a joint venture may have exist *332 ed between the IDB, the City, the County, and the State for the purpose of enticing Hyundai to locate an automobile-manufacturing plant in Montgomery County, substantial evidence does not exist to create a jury question as to whether Hyundai was a participant in the joint venture. The evidence indicates that Hyundai merely evaluated Montgomery’s incentive package, compared it to the incentive packages offered by other communities, and determined that Montgomery provided the best place to build its plant. Thus, the Russells and the McLemore group have not presented substantial evidence indicating that Hyundai was a participant in a joint venture; therefore, Hyundai cannot be liable for the alleged breach of contract.
Because substantial evidence of neither an agency relationship nor a joint venture is present in the record, the summary judgment for Hyundai is affirmed.

II. Whether the amendment to the Russells’ option agreement waived the most-favored-nation clause in the original option agreement.

The Russells and the IDB amended their option agreement in February 2002. The IDB argues that the amendment effectively waived the most-favored-nation clause. The Russells contend that the amendment did not waive the most-favored-nation clause set forth in the original option agreement.
According to the Russells, the sole purpose of the amendment to the option agreement was to extend the date of the option another 120 days past the February 2002 expiration date. They maintain that because the amendment to the option agreement did not specifically state that it was deleting or waiving the most-favored-nation clause, the clause remained in effect. The Russells rely on the language in the amended option agreement, which provides that “[ejxcept as amended hereby, the Option is in all other respects ratified and confirmed,” and the language in the original option agreement, which requires that “no waiver of any of [the] terms and conditions [of the option agreement] shall be effective unless made in writing and duly executed by the parties” to the option agreement. They reason that because the amendment to the option agreement did not specifically delete or waive the most-favored-nation clause, that clause remains enforceable.
The IDB maintains that because the language in the amendment to the option agreement with regard to the purchase price is unambiguous and no longer includes a formula to determine the purchase price, i.e., a most-favored-nation clause, but establishes a definite purchase price of $4,500 per acre, the most-favored-nation clause was eliminated from the option agreement between the Russells and the IDB.
In Winkleblack v. Murphy, 811 So.2d 521, 528 (Ala.2001), this Court stated that if a court determines that a contract provision is ambiguous and
“ ‘there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. Additionally, “if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed.” ’ ”
(Quoting Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala.2000).)
Parties may modify the terms of their agreement and “if the terms of a *333 subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail.” Cavalier Mfg., Inc. v. Clarke, 862 So.2d 634, 641 (Ala.2003).
“It is a general rule that a party-claiming that a contract modifies a prior contract must show that the later contract is definite and certain as to the terms of modification, and the modification extends only so far as the terms are definite, certain and intentional. 17 C.J.S. Contracts § 347, p. 424.
“ ‘[W]hen the terms of the original contract are undisputed and were thereafter altered or changed by the mutual agreement of the parties and the extent of that modification only was in dispute, it is clearly “a question for the jury to determine.” ’ Jeff D. Jordan & Co. v. Yancey & Abernathy, 242 Ala. 385, 6 So.2d 473 [ (1942) ].”
Johnson-Rast & Hays, Inc. v. Cole, 294 Ala. 32, 37, 310 So.2d 885, 889 (1975).
“ ‘[I]t is elementary that it is the terms of the written contract, not the mental operations of one of the parties, that control its interpretation.’ Kinmon v. J.P. King Auction Co., 290 Ala. 323, 325, 276 So.2d 569, 570 (1973) (citing Todd v. Devaney, 265 Ala. 486, 92 So.2d 24 (1957)). ‘Stated another way, the law of contracts is premised upon an objective rather than a subjective manifestation of intent approach.’ Lilley v. Gonzales, 417 So.2d 161, 163 (Ala.1982). “‘[A] court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.” ’ Turner v. West Ridge Apartments, Inc., 893 So .2d 332 (Ala.2004)(quoting Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 36 (Ala.1998)).”
Harbison v. Strickland, 900 So.2d 385, 391 (Ala.2004).
The original option agreement between the Russells and the IDB provided:
“3. If Purchaser elects to exercise this Option, the purchase price for the Property shall be determined as follows:
“Sellers and Purchaser shall each, at its own cost and expense, secure a current appraisal of the Property. The purchase price shall be the average of the two appraisals provided, however, in no event shall the purchase price be less than $4,500 per acre and further provided that the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property. The acreage shall be determined by a good and accurate survey provided by Purchaser.
[[Image here]]
“16. This Option constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Option and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.”
(Emphasis added.)
The amendment to the option agreement stated:
“1. It is hereby agreed that the purchase price for the Property is Four Thousand Five Hundred and No/100 ($4,500) per acre. The exact number of acres to be determined by the survey provided by Purchaser.
[[Image here]]
*334 “3. Except as amended hereby, the Option is in all other respects ratified and confirmed.”
(Emphasis added.)
We hold that the terms of the amendment to the option agreement are not “definite and certain” as to waiver of the most-favored-nation clause in the original option agreement. The language of the original option agreement specifically provided that for a waiver of a term of the agreement to be effective, the waiver must be in writing and executed by both parties. Although the language in the amendment to the option agreement sets forth the price per acre at $4,500, we cannot conclude that the language in the amended option as a matter of law modified or waived the most-favored-nation clause in the Russells’ original option agreement. Therefore, a question for the jury exists as to whether the amended option agreement modified or waived the most-favored-nation clause in the Russells’ original option agreement, and a summary judgment for the IDB and against the Russells on this ground is not proper.

III. Whether summary judgment for the IDB and against the Russells and, the McLemore group on the basis that under the doctrine of merger the option agreements had no effect once the deeds were executed and delivered is proper.

The Russells and the McLemore group contend that the trial court erred in entering a summary judgment for the IDB because, they say, there is a genuine issue of material fact as to the meaning and application of the most-favored-nation clause in the option agreements. The IDB argues that, pursuant to the doctrine of merger, the Russells’ and the McLemore group’s execution and the delivery of the deeds to their properties to the City-and the County merged the option agreements into the deeds and discharged any additional debt owed for the properties; therefore, the IDB contends, their breach-of-contract claims are barred.
When an option is exercised, the agreement becomes a contract between the parties. McGuire v. Andre, 259 Ala. 109, 65 So.2d 185 (1953), and Jenkins v. Thrift, 469 So.2d 1278 (Ala.1985).
“ ‘Under the doctrine of “merger,” ordinarily, in the absence of fraud or mistake, when a contract to sell and convey real estate has been consummated by the execution and delivery of a deed, as in this case, the preliminary contract becomes functus officio, and the deed becomes a sole memorial of the agreement, and upon it the rights of the parties rest; but the doctrine may be inapplicable to cases in which stipulations of the preliminary contract, instead of becoming merged in the deed, are incorporated therein and thus survive to confer independent causes of action, and in such instances the intention of the parties is of paramount importance.’
“Russell v. Mullis, 479 So.2d 727, 730 (Ala.1985)(citing Alger-Sullivan Lumber Co. v. Union Trust Co., 207 Ala. 138, 92 So. 254 (1922); Roberts v. Peoples Bank & Trust Co., 410 So.2d 393 (Ala.1982)).”
Eubanks v. Pine Plaza Joint Venture, 562 So.2d 220, 221-22 (Ala.1990). See Boyce v. Cassese, 941 So.2d 932, 942-43 (Ala.2006).
However, a deed does not have to set forth the amount of consideration. § 35-4-34, Ala.Code 1975. This Court stated in Albreast v. Heaton, 276 Ala. 185, 188-90, 160 So.2d 470, 472-74 (1964):
“It is said in 32 C.J.S. Evidence § 950, pp. 873-876, as follows:
“ ‘It is a well established rule, sometimes embodied in statutes, that the *335 true consideration of a deed of conveyance may always be inquired into, and shown by parol evidence, without allegations of fraud or mistake, or seeking reformation of the deed, as for the purpose of showing the amount or character of the consideration, or by whom it was paid, for the obvious reason that a change in, or contradiction of, the expressed consideration does not affect in any manner the covenants of the grantor or grantee, and neither enlarges nor limits the grant. It is also permissible, where there is no contradiction of the contractual terms of the instrument, to show want or failure of the consideration recited in a deed; but these rules cannot be extended so as to let in proof overturning the operative words of the grant in a deed free from ambiguity, or contradicting the deed itself or the descriptions therein, or for the purpose of invalidating the instrument or impairing its effect as a conveyance, as by showing that there was no consideration, unless there are special circumstances such as fraud, retention of possession by the grantor, or the like. Where the consideration is stated not by way of mere receipt or recital of fact, but in such a way as to make it one of the terms of the contract between grantor and grantee, a different consideration, whether variant or additional, cannot be shown by parol.’
“This court, in the case of Union Bank & Trust Co. v. Royall, 226 Ala. 670, 148 So. 399(2) [(1938)], held as follows:
“ ‘It is a well settled general rule that parol evidence is admissible to show the true consideration of like kind as expressed in the deed, that it is greater or less, but evidence going to show a consideration of a different kind is not admissible. Pique Manier & Hall v. Arendale, 71 Ala. 91 [ (1881) ]; Gilliland v. Hawkins, 216 Ala. 97, 112 So. 454 [ (1927) ]; McGehee v. Rump, 37 Ala. 651 [ (1861) ]; 10 R.C.L. p. 1043, § 237; 22 C.J. p. 1161, § 1557; Maurice O’Connell v. Jasper Kelly, 114 Mass. 97 [ (1873) ].’
[[Image here]]
“In Murphy v. Branch Bank at Mobile, 16 Ala. 90 [ (1849) ], we observed:
“ ‘The general rule is too well established now to be shaken, that a consideration not expressed in a deed, and which is inconsistent with the consideration expressed cannot be shown by parol proof. 1 Greenl.Ev. §§ 285; Mead v. Steger, 5 Port. 498 [ (1837) ]; [Toulmin v. Austin ] 5 Stew, and P. 410. If, however, there is no consideration expressed, proof may be received to show what the consideration was. 1 Vesey, 128; [Davenport v. Mason ] 15 Mass. 92. And it is said, if a deed mentions a consideration, and adds the words for other considerations, that proof may be received to show what those other considerations are. So if a monied consideration is expressed, proof may be received to show that the sum was greater or less than the amount expressed in the deed. But the authorities deny that parol proof can be received to establish a consideration wholly different from that expressed in the deed. Garrett v. [Stuart], 1 McCord, 514 [ (1821) ]; Starkie Ev. 1004; [Mead v. Steger ] 5 Port. 506; [Schemerhorn v. Vanderheyden ] 1 Johns. 139 [3 Am.Dec. 304] [ (1806) ].’ ”
In Gilliland v. Hawkins, this Court stated that
*336 “ ‘the consideration clause of a deed is open to the influence of parol proof, except for two purposes: First it is not permissible for a party to the deed to prove a different consideration, if such change vary the legal effect of the instrument; and, second, the grantor in a deed, who acknowledges the receipt of payment of the consideration, will not be allowed, by disproving the fact, to establish a resulting trust in himself.’
“Subject to the two restrictions stated, it has always been held that the consideration in a deed may always be inquired into, and any other or any additional consideration may be shown, if not inconsistent with that expressed in the deed.”
216 Ala. 97, 101, 112 So. 454, 457 (1927)(opinion on rehearing). See also Milu, Inc. v. Duke, 204 So.2d 31 (Fla.Dist.Ct.App.1967) (concluding that evidence is admissible to show what consideration is paid although a deed has been accepted because contractual provisions as to considerations to be paid by the purchaser are ordinarily not merged in the deed); Purbaugh v. Jurgensmeier, 240 Neb. 679, 483 N.W.2d 757 (1992) (holding that because the purchase price typically is not included in the deed, this term of the contract of sale is not merged with the deed).
Thus, the mere execution and delivery of a deed does not merge the consideration in the contract of sale into the deed. As we stated in Lipscomb v. Tucker, 294 Ala. 246, 256, 314 So.2d 840, 848 (1975):
“If the receipt of valuable consideration is recited in a deed, the recital is merely prima facie evidence of the full agreed consideration and parol evidence is admissible to show that other and additional valuable consideration was to be received by the grantor such as additional money or credit on a pre-existing debt or mortgage.”
Here, the deeds in question provide that the consideration is “$10.00 and other valuable consideration.” This recitation of consideration permits inquiry into like consideration for the sale of the properties, and the Russells’ and the McLe-more group’s breach-of-contract claims are not barred by the doctrine of merger.
We reject the IDB’s argument that this Court’s decision in Carter v. Beck, 40 Ala. 599 (1867), requires the conclusion that the execution and delivery of the deed forecloses the breach-of-contract claims of the Russells and the McLemore group. The IDB explains Carter as follows:
“Beck sued Carter for Carter’s failure to convey 1229 acres of land as called for in their agreement. Carter had only conveyed 1190 acres; however Beck claimed that the unsecured personal promissory note given for the purchase price, which was subsequently paid in full, should have been reduced by a per-acre price of $19.90 for the acreage not conveyed. The buyer was suing the seller to recover an excess amount paid, whereas in the case sub judice, the seller is suing the buyer for an alleged underpayment. The Court emphatically held that the deed was ‘a complete execution of the antecedent agreement to convey, and annulled it; and no action at law can be sustained upon it.’ 40 Ala. at 606.”
(IDB’s brief at p. 37.) The IDB argues that Carter requires the conclusion that the delivery and execution of the deed forecloses the breach-of-contract claims. However, the language for consideration provided in the deed in Carter is different from the language providing for consideration in the deeds in this case. In summarizing the facts in Carter, it was specifically noted:
*337 “The deed recited the sale under the order of the probate court; described the several tracts of land by the numbers of the section, township, and range, specifying the number of acres in each tract, and as ‘containing in all about twelve hundred and twenty-nine acres,’ though the aggregate number of acres specified as contained in the several tracts amounted to eleven hundred and ninety 94-100; recited that the ‘said land was struck off to Wml. Beck, for the sum of twenty-four thousand four hundred and fifty-seven 10-100 dollars,’ and conveyed to said Beck the title which the decedent had at the time of his death.”
40 Ala. at 603. Thus, unlike the deed in Carter where the consideration was specified in the deed and the deed became the evidence of the previous agreement between the seller and the buyer, the deeds here do not provide the specific consideration, but provide only for consideration of “$10.00 and other valuable consideration,” which permits further inquiry. Consequently, the deeds in this case are not “a complete execution of the antecedent agreement to convey,” 40 Ala. at 605, and the doctrine of merger is inapplicable.
Next, we must determine whether the language in the option agreements is ambiguous. According to the Russells and the McLemore group, the language in the most-favored-nation clause is ambiguous and a genuine issue of material fact exists for the jury as to whether the Shelton property was part of “the project planned for this Property” and, if the Shelton property is part of the project, whether, like Shelton, the Russells and the McLemore group should have been paid $12,000 per acre. They maintain that the following presents substantial evidence to overcome a summary judgment for the IDB on this issue:
1. The most-favored-nation clause provided that “[t]he purchase price shall be the average of the two appraisals provided, however, in no event shall the purchase price be less than $4,500 per acre and further provided that the purchase price shall in no event be less than the price per acre paid to any landowner included in the project planned for the Property.”
2. The language in the most-favored-nation clause does not state that the purchase price would be no less than “the price per acre paid by the IDB to any other landowner in the project,” but states that the price would be no less than “the price per acre paid to any other landowner included in the project.”
3. The IDB’s admission that it did not provide the funds to purchase any of property for the project.
4. The project involved the assimilation and preparation of land for the Hyundai automobile-manufacturing facility.
5. The initial project plans included a rail yard that ran east and west on the optioned property.
6. The IDB had approached Shelton several times about acquiring an option agreement to purchase the Shelton property.
7. Hyundai made a decision to run its rail yard north to south only a few days before it announced where it would locate its plant, and, at that time, it requested that an option agreement be acquired on the Shelton property to permit the revision of the rail yard.
8. Because Shelton had been previously approached about an option agreement on her property, Strange and various officials confronted with Hyundai’s last-minute request knew that Shelton would not agree to a purchase price of $4,500 per acre.
*338 9. The option agreement on the Shelton property was acquired by Mayor Bright, an ex officio member of the IDB, and Randy George, the secretary of the IDB.
10. When the property for the project was surveyed, as required by the project agreement, the survey included the Shelton property as part of the project site.
11. Section 3.20 of the project agreement requires the Shelton property be acquired for the project.
12. The tax-abatement agreement between the IDB and Hyundai includes the Shelton property.
13. The IDB leased the Shelton property as well as the other property from Hyundai for development of the project site.
The IDB argues that it cannot be held to have breached the option agreements because, it says,. Hyundai decided to purchase the Shelton property with funds provided by the State at a price greater than $4,500 per acre. The IDB reminds this Court that the evidence establishes that it refused to have any involvement with the purchase of the Shelton property. It further argues that the evidence establishes that the IDB did not pay any landowner with which it executed an option agreement more than $4,500 per acre. It reasons that the only reasonable interpretation of the option agreements is that the most-favored-nation clause obligated the IDB to pay all landowners with which it executed an option agreement the same amount. It argues that the fact that another entity paid Shelton a greater amount does not establish that the IDB breached the option agreements with the landowners to whom it paid $4,500 per acre.
Additionally, the IDB argues that the option agreements are unambiguous with regard to which parcels of land were “included in the project planned for this Property.” They disagree with the Rus-sells and the McLemore group that the Shelton property is part of the project and maintain that the project agreement defines the “project planned for this Property” as only the property as to which the IDB had obtained options to purchase.
We agree with the Russells and the McLemore group that the language in the option agreements is ambiguous, that it cannot be resolved by rules of contract construction, and that they presented substantial evidence creating a genuine issue of material fact for the jury as to the meaning and application of the most-favored-nation clause in the option agreements. Specifically, the provisions, “[i]f Purchaser elects to exercise this Option the purchase price for the Property shall be determined as follows” and “the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property” are ambiguous because reasonable persons could differ on whether “the price per acre paid to any other landowner included in the project” refers to a purchase price paid only by the IDB or to a purchase price paid by any purchaser for property included in the project. If the implication is that the language refers to payments only by the IDB, then the most-favored-nation clause is triggered only if the IDB paid other landowners more than it paid the sellers — the Russells and the McLemore group. If the language refers to a purchase price paid by any purchaser on property for the project, then the most-favored-nation clause is triggered regardless of whether the purchase price was paid by the IDB or another entity. Reasonable persons could differ over whether the reference to “price per acre paid to any other landowner” includes by implication the interlineation of the phrase “by *339 the IDB” so that the contract means that the most-favored-nation clause is triggered only when the purchase price paid by the IDB to any other landowner exceeds the price paid to the seller. Thus, a jury question is presented. Additionally, depending on resolution of the above ambiguity, the evidence is in conflict as to whether Shelton was a “landowner included in the project.” Because reasonable persons can differ on the meaning of the clause, i.e., whether the language “price per acre paid to any other landowner included in the project” obligated the IDB to pay the Russells and the McLemore group $12,000 per acre and whether the Shelton property was included as part of the project site, the evidence presents questions for the jury to resolve, and the summary judgment for the IDB is reversed.
The language in the option agreements is ambiguous, and its meaning and whether the clause was breached cannot be determined without considering evidence outside “the four corners” of the option agreements.
“It is the province of the court to construe written instruments, and declare the legal effect. But when the legal operation and effect of an instrument depends, not only on the meaning and construction of its words, but upon collateral facts in pais [outside the contract] and extrinsic evidence, the inference from the facts to be drawn from the evidence should be submitted to the jury.”
Boykin v. Bank of Mobile, 72 Ala. 262, 269 (1882). See also Merchants Nat’l Bank of Mobile v. Cotnam, 250 Ala. 316, 326, 34 So.2d 122, 130 (1948) (“‘While it is the province of the court to construe written contracts, where the meaning is to be collected from the writing without the aid of evidence aliunde [from another source], yet where the meaning, the intent of the parties, depends upon the ascertainment of facts aliunde the instrument, this “admixture of parol and written evidence draws the whole to the jury requires the submission of the issue to, the deduction of the inference of fact, by the jury.” ’ ”). Thus, submission of the case to the jury is proper, and the summary judgment for the IDB is reversed.

IV. Whether the trial court erred in granting the IDB’s motion for a protective order prohibiting deposing Thomas T. Gallion III, counsel for the IDB.

Because we reverse the summary judgment for the IDB, we do not reach the issue whether the trial court exceeded the scope of its discretion by granting the IDB’s motion for a protective order prohibiting deposing Thomas T. Gallion III, legal counsel for the IDB. Reconsideration of this issue by the trial court on remand is proper.

Conclusion

The summary judgment for Hyundai is affirmed; the summary judgment for the IDB is reversed, and this case is remanded for proceedings consistent with this opinion.
1070516 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1070517 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and SEE, LYONS, WOODALL, SMITH, and BOLIN, JJ., concur.
MURDOCK, J., concurs in part and dissents in part.

. The IDB explained in its brief to this Court that it is involved in the process "to comply with laws for tax breaks and incentives to the industry.”

. At Hyundai’s request, the IDB did not reveal the identity of the potential industrial project.

.The provision "the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property” is known as a most-favored-nation clause or a price-escalation clause.

. In the pleadings and briefs to this Court, this property is also referred to as the Shelton-Walker property.

. Echols was the project manager at the Alabama Development Office for the Hyundai project.

. Evans is another CSX official involved in the Hyundai project.

. Frank McPhillips was one of the attorneys for the State involved in the Hyundai project.

. In order for ALDOT to perform site preparation, the property had to be owned by a governmental entity. Therefore, Hyundai leased the property to the IDB so that a governmental entity would have a possessory interest in the property, which would allow ALDOT to perform the site preparation.