SMITH, Justice.
The plaintiffs[1] in the underlying actions sued the petitioner, the Industrial Devel *701 opment Board of the City of Montgomery (“the IDB”), in the Montgomery Circuit Court alleging breach of contract. During discovery, the plaintiffs sought to depose Thomas T. Gallion III, one of the attorneys for the IDB. The trial court denied the IDB’s motion for a protective order preventing Gallion’s deposition, and the IDB has petitioned this Court for a writ of mandamus directing the trial court to vacate the order denying the IDB’s motion for a protective order and to enter an order granting the motion. We grant the petition and issue the writ.

Facts and Procedural History

The following facts, taken from this Court’s opinion in a previous consolidated appeal in the underlying actions, McLemore v. Hyundai Motor Manufacturing Alabama, LLC, 7 So.3d 318 (Ala.2008), are relevant to the present petition:
“George E. Russell and Thomas E. Russell, as coexecutors and cotrustees of the will and testamentary trust of Earnest W. Russell, and Myrtis Russell (‘the Russells’), and Price McLemore, Mary H. McLemore, John Melnnis, Jr., Timothy N. Melnnis, Charles R. Melnnis, Williams S. Newell, and the Peoples Bank and Trust Company, as trustee for the Adaline Hooper Trust A and B (‘the McLemore group’), sued the Industrial Development Board of the City of Montgomery (‘the IDB’) and Hyundai Motor Manufacturing Alabama, LLC (‘Hyundai’), alleging breach of contract. Specifically, they alleged that the IDB, on behalf of Hyundai, exercised options to purchase their real property but failed to pay them in accordance with the most-favored-nation clause in the option agreements the same price per acre that was paid to another landowner....

“Facts

“In September 2001, various officials of the State of Alabama, the City of Montgomery (‘the City’), the Montgomery County Commission (‘the County[1]), the Montgomery Area Chamber of Commerce, and the Montgomery Water Works Board began making preparations to secure options to purchase property in the Montgomery area to create an incentive package in the hope that they could persuade Hyundai to build an industrial plant in the Montgomery area for the purpose of manufacturing and assembling motor vehicles. This intent is evidenced by a signed letter to Hyundai from the City, the County, and the IDB stating that they, ‘in partnership with the State,’ would commit to providing an industrial site to Hyundai at no cost. Although the funds to purchase the property were to be provided by the City and the County only, the option agreements on the property were acquired by the IDB, whose primary role in industrial projects is to ‘serve as the entity through which monies flow for the purchase of land for the ultimate use in industry.’ B.M. Ahn, the Hyundai representative in charge of Hyundai’s project to open a plant in the United States, testified during his deposition that one of the basic elements of an incentive package is ‘free land’ offered to an automobile company as part of the incentive for the company to locate in a certain area. Ahn stated that Hyundai had no role in acquiring the options on the land.
*702 “The Russells owned approximately 328 acres of land in Montgomery County. In the fall of 2001, Reuben Thornton, the chairman of the IDB, entered into an option agreement on behalf of the IDB to purchase the Russells’ property for an industrial project. The agreement provided an option period of 120 days and stated:
“ ‘3. If Purchaser elects to exercise this Option the purchase price for the Property shall be determined as follows:
“ ‘Seller and Purchaser shall each, at its own cost and expense, secure a current appraisal of the Property. The purchase price shall be the average of the two appraisals provided, however, in no event shall the purchase price be less than $4,500 per acre and further provided that the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property. The acreage shall be determined by a good and accurate survey provided by Purchaser.[2]
[[Image here]]
“ ‘16. This Option constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property. It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants, and conditions herein set forth, and that no modification of this Option and no waiver of any of its terms and conditions shall be effee-five unless made in writing and duly executed by the parties hereto.’
“The Russells and the IDB amended the option agreement in February 2002 to provide:
“T. It is hereby agreed that the purchase price for the Property is Four Thousand Five Hundred and No/100 Dollars ($4,500.00) per acre. The exact number of acres to be determined by the survey provided by Purchaser.
“ ‘2. The option period is hereby extended for a period of 120 days from the Effective Date of the Option, which Effective Date is October 3, 2001. The expiration date of the Option, as extended, is now May 31, 2002.
“ ‘3. Except as amended hereby, the Option is in all other respects ratified and confirmed.’
“In February 2002, Thornton, on behalf of the IDB, entered into an option agreement with the McLemore group, who owned approximately 54 acres of land near the Russell property. The terms in the option agreement with the McLemore group are identical to the terms in the original option agreement between the Russells and the IDB.
“The IDB also acquired four additional option agreements with landowners near the property belonging to the Rus-sells and the McLemore group. During the acquisition process, the IDB approached Joy Shelton about an option to purchase her property; however, she refused to enter into an option agreement. The IDB decided that the Shelton property was not necessary for the incentive package. By mid-March 2002, the IDB *703 determined that it was not going to designate any additional funds, other than the funds already committed, to this particular project. The State and the IDB sent the incentive package, including the proposed project site, to Hyundai for consideration.
“On March 28, 2002, Ahn contacted Todd Strange, then the director of the Alabama Development Office. He stated that Hyundai had not decided whether to locate the plant in Montgomery or in Kentucky but that additional property would need to be acquired for the rail access Hyundai required if Montgomery was to be selected as the site for the Hyundai plant. Ahn informed Strange that he would need an answer by noon of the next day as to whether the property could be acquired. Strange met with various State, City, and County officials to discuss Hyundai’s request. Recognizing that the City and the County would not provide additional funds to acquire more property and that the other option agreements contained most-favored-nation clauses, they decided to ask CSX Transportation, Inc., the rail company, to acquire the option to purchase the Shelton property. On March 29, 2002, Strange sent David Hemphill, an assistant vice president for CSX, the following letter via facsimile:
“ ‘Last evening, Thursday, March 28, 2002, at 6:05 p.m. Central Standard Time, I received a call from Mr. B.M. Ahn, President Hyundai Motor Company, U.S. from Seoul, Korea. He told me they were in the final stages of the decision and needed to make modifications to their Montgomery site layout because the CSX Railroad yard estimate had come in extremely high. In their (Hyundai’s) redesign, he wanted to do parallel tracks running north and south on the eastern side of the property boundary. His engineers told him he would not have enough room unless [additional property was] obtained in the southeast corner of the quadrant. This property had been discussed a couple of months ago but we had been told as recently as two weeks ago that it would not be necessary. So accordingly, we did not pursue any options ....
“‘As I indicated to you last night, our option agreements have a “most favored nation” clause where we agreed to pay no more for any one parcel than any of the other parcels. Accordingly, I assembled a working group of the local Chamber of Commerce executives, engineering expertise, Dave Echols[3] and myself. We decided the most appropriate course to follow would be to ask CSX to obtain a parcel for rail access to keep it outside the project agreement. As you know CSX’s agreement with Hyundai is separate and this property in their view is for rail access only....
[[Image here]]
“ ‘Dave, as you can appreciate there are a lot of details to be worked out, but the spirit and concept is for CSX to obtain the needed parcel for rail access and whatever the purchase price, CSX would be made whole in a manner we mutually agreed upon.’
“Also on March 29, 2002, Hemphill sent the following e-mail to Dave Echols:
“ ‘Regarding the [Shelton property] that will need to be purchased, you asked if CSX would be willing to buy *704 this property for the State and Montgomery at approximately $8,000.00 an acre. There is no contract or option on the property currently and you estimate it will cost us approximately $750,000.00 which you are willing to refund to us in some fashion during the track construction phase. Randy Evans[, a CSX official,] in principle agreed to this and I ask that you fax us a letter outlining exactly what you have in mind. The purpose of doing it this way rather than what you did in getting control of the other 1600 acres is to avoid paying the other landowners $8,000.00 an acre which would have a negative impact of $10,000,000.00 on the site cost. The railroad does not get good land values in a situation like this and so I think there will be upward pressure on that $8,000 number. Moreover, the other landowners will get wind of this ploy and may create negative community publicity.... In your letter to us we would ask that you indicate exactly how you intend to pay us during the track work construction.’
“Mayor Bobby Bright, mayor of the City of Montgomery and an ex officio member of the IDB, was selected as the main representative to meet with Shelton to acquire an assignable option agreement designating the City as the purchaser of the Shelton property. Before Bright agreed to meet with Shelton, he told Strange and other State officials that the City and the County would not provide any additional money toward the project. They assured him that the City and the County would not be asked or expected to contribute any funds toward the purchase of the Shelton property and that the option would be assigned to either CSX or the State. Randy George, president of the Montgomery Area Chamber of Commerce and secretary of the IDB, and [Ellen] McNair, a member of the Chamber of Commerce, went with Bright to meet with Shelton. Bright obtained an assignable option, designating the City, not the IDB, as the purchaser of the property; the purchase price of the property was $12,000 per acre.
“McNair informed Thomas H. Gallion III, the IDB’s attorney, of the acquisition of the option to purchase the Shelton property. During her deposition, she stated:
“ ‘On Friday when ... I came back from visiting with Mrs. Shelton, I contacted both Mr. Gallion and Mr. [Frank] McPhillipsf, one of the attorneys for the State involved in the Hyundai project]. My concern was,
... just to let them know what had happened, you know, with Thursday night because it happened so fast. They were not aware of it until after the fact, so I wanted to tell them what had happened.
“ ‘But also I was just a little concerned with [Mayor Bright] taking out the option — because he was a local person, and his action of just taking out the option which would be assigned to CSX or somebody, that just made me a little nervous.
“ ‘So I just said — you know, I was, you know, just calling them just to be sure that that wouldn’t trigger any — you know, we just didn’t know whether or not that would, and so I just wanted to be sure. So I contacted both of them.’
“On April 1, 2002, Hyundai announced that it was going to build the plant in Montgomery. On April 15, 2002, the various State and local governmental entities involved, including the IDB, entered into a project agreement with Hyundai detailing the location and de *705 velopment of the plant (‘the project agreement’). The project agreement, in section 3.1 of Article 3, stated that ‘the Montgomery IDB presently holds purchase options necessary to acquire fee simple title to each parcel of real estate comprising the Project Site.’ The project agreement further provided in section 3.4 that the IDB was to exercise each option and in section 3.6(a) that the IDB was then to transfer title of the property to Plyundai. Section 3.20 of the project agreement, entitled ‘CSX Agreement,’ provided separately for the acquisition of the Shelton property, stating:
“ ‘The State and Local Governments shall use their best efforts to cause CSX Transportation to enter into an agreement with [Hyundai] in form satisfactory to [Hyundai], which will provide for rail service for [Hyundai] on terms and conditions as favorable to [Hyundai] as those offered to other automobile manufacturers. In addition, the State and City shall use their best efforts to cause CSX Transportation to provide the incentives set forth in the letter from CSX Transportation dated December 17, 2001. The State represents and warrants that [Hyundai] will acquire fee simple title to [the Shelton property] for use in connection with construction of a rail switch yard by or before September 30, 2002. If and to the extent [Hyundai] makes any payment for the cost of acquiring such acreage, the State shall reimburse [Hyundai] for such costs by increasing by an equivalent amount the monies made available from the State in Training Equipment Fund pursuant to Article 4 by no later than the last quarter of the calendar year 2003. The City agrees that it will zone such additional acreage the same as the Project Site. The Local Governments agree to abate taxes that are applicable to such additional acreage in the same manner and to the same extent as ... abatement of taxes of the Project Site.’
“The IDB assigned the options on the property owned by the Russells and the McLemore group to the City and the County. On May 14, 2002, the City and the County purchased the property for $4,500 per acre. The City and the County then deeded the property to the IDB, which then deeded the property to Hyundai.
“The City never exercised its option on the Shelton property. On May 22, 2002, Henry Mabry, then director of finance for the State, sent Ahn a letter confirming that the State would be funding the purchase of the Shelton property, stating:
“ ‘This is to confirm that the State of Alabama will provide the funding for the purchase of the 93 acres set aside for Hyundai’s rail yard on the date of closing. This will obviate any need for Hyundai to borrow to pay for this acquisition. In addition, the State will pay the reasonable due diligence costs incurred in connection with Hyundai’s acquisition of this property. This letter of assurance is being provided to you pursuant to Section 3.20 of the Project Agreement.’
“On May 31, 2002, the day the option agreement on the Shelton property was to expire, CSX entered into a real-estate sales contract for the purchase of the property at $12,000 per acre. When Hyundai learned that CSX, and not the State, was to pay for the rail installation and that Hyundai would be expected to enter into a long-term contract with CSX, Hyundai decided to install the rail using its own funds. As a result of Hyundai’s decision not to involve CSX in *706 rail installation, CSX assigned the real-estate contract to Hyundai. According to the assignment contract, CSX assigned the contract to Hyundai on May 28, 2002, three days before the real-estate contract between CSX and Shelton was executed. On July 12, 2002, funds from the State of Alabama Incentives Finance Authority were transferred to Hyundai to pay for the Shelton property, and Hyundai purchased the property.
“After all the land was acquired and deeded to Hyundai, Hyundai leased all the property, including the Shelton property, to the IDB so that the Alabama Department of Transportation (‘ALDOT’) could perform site preparation on the property. Additionally, the IDB entered into a tax-abatement agreement with Hyundai so that Hyundai’s property could receive the previously agreed upon abatement from ad valorem taxation and other tax incentives. The Shelton property was included in the tax-abatement agreement.
“Subsequently, the Russells and the McLemore group each filed a breach-of-contract action against the IDB and Hyundai, alleging that the IDB and Hyundai had breached the most-favored-nation clause in the option agreements by not paying them $12,000 per acre for their property. According to the Russells and the McLemore group, the Shelton property was ‘included in the project agreement’ and, consequently, they should have been paid, as Shelton was paid, $12,000 per acre for their property. After some discovery, the IDB and Hyundai moved for summary judgments. The trial court denied the motions. Additional discovery was conducted, and a special master was appointed. The IDB and Hyundai filed renewed motions for a summary judgment. The special master heard oral arguments on the motions and then recommended to the trial court that the motions for a summary judgment be granted. The trial court, after considering the special master’s recommendation, entered summary judgments for the IDB and Hyundai. The Russells and the McLemore group appealed.”
7 So.3d at 321-26 (footnotes omitted).
In McLemore, this Court affirmed the summary judgment entered in favor of Hyundai but reversed the summary judgment entered in favor of the IDB. In light of the reversal of the summary judgment as to the IDB, however, we declined to address “the issue whether the trial court exceeded the scope of its discretion by granting the IDB’s motion for a protective order prohibiting deposing Thomas T. Gal-lion III, legal counsel for the IDB.” 7 So.3d at 339. We stated that “[rjeconsid-eration of this issue by the trial court on remand is proper.” Id.
On remand, the plaintiffs filed a motion in the trial court on February 5, 2009, to compel Gallion’s deposition. The IDB filed a response and moved for a protective order. On March 5, 2009, the special master assigned to the case recommended that the trial court grant the motion to compel Gallion’s deposition. That same day, the trial court entered an order adopting the special master’s recommendation. The trial court’s March 5 order stated:
“[The plaintiffs seek] to take the deposition testimony of one of Defendant IDB’s counsel, Thomas T. Gallion, III, concerning his involvement in the negotiation and exercise of the options, the negotiations concerning the Project Agreement, and the closing of the sale. This Court is well aware of the standards set forth in Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir.1986). After applying those standards *707 to this matter, it is the opinion and order of this Court that [plaintiffs be permitted to take the deposition testimony of Mr. Gallion as to these limited areas.”
Noting that “it is likely that during the deposition testimony, Mr. Gallion and/or his counsel will object to certain questions that Mr. Gallion and/or his counsel deem improper,” the trial court instructed the special master to attend the deposition and to “make immediate rulings on objections that may arise.”
On March 12, 2009, the plaintiffs issued a notice of deposition for Gallion, stating that the deposition would be videotaped and requesting that Gallion have certain documents available for production at the deposition.[4]
On March 13, 2009, the IDB filed an objection to the deposition notice and again moved for a protective order. Among other things, the IDB requested the trial court to reconsider its March 5 order. On April 10, 2009, in a supplement to its motion for a protective order, the IDB asked the trial court to consider, as an alternative, that Gallion’s deposition be taken upon written questions and not oral examination. The supplemented motion noted that the plaintiffs had initially requested to depose Gallion upon written questions.
On April 1, 2009, the plaintiffs issued another notice of deposition to Gallion, along with additional requests for the production of documents. On April 9, 2009, the plaintiffs issued a third notice of deposition to Gallion. Both notices indicated the deposition would be videotaped.
On April 15, 2009, the special master recommended that the video deposition of Gallion be permitted on the three areas set forth in the trial court’s order of March 5, 2009, i.e., Gallion’s involvement in (1) the negotiation of the option agreements and the exercise of the options; (2) the negotiations concerning the project agreement; and (3) the closing of the “sale.” The special master also recommended that Gal-lion be required to produce the requested documents by April 20, 2009. The trial court adopted those recommendations in an order on April 15, 2009. On April 20, 2009, the IDB filed its petition for the writ of mandamus.

Standard of Review

“‘A writ of mandamus will be “issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.” Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993).’
“Ex parte Horton Homes, Inc., 774 So.2d 536, 539 (Ala.2000). Regarding discovery matters specifically, this Court has stated:
“ ‘Discovery matters are within the trial court’s sound discretion, and this Court will not reverse a trial court’s ruling on a discovery issue unless the trial court has clearly exceeded its discretion. Home Ins. Co. v. Rice, 585 So.2d 859, 862 (Ala.1991). Accordingly, mandamus will issue to reverse a trial court’s ruling on a discov *708 ery issue only (1) where there is a showing that the trial court clearly exceeded its discretion, and (2) where the aggrieved party does not have an adequate remedy by ordinary appeal. The petitioner has an affirmative burden to prove the existence of each of these conditions.
“‘Generally, an appeal of a discovery order is an adequate remedy, notwithstanding the fact that that procedure may delay an appellate court’s review of a petitioner’s grievance or impose on the petitioner additional expense; our judicial system cannot afford immediate mandamus review of every discovery order.’
“Ex parte Ocwen Federal Bank, FSB, 872 So.2d 810, 813 (Ala.2003) (footnote omitted). In Ocwen, this Court identified ‘four circumstances in which a discovery order may be reviewed by a petition for a writ of mandamus.’ Ex parte Dillard Dep’t Stores, Inc., 879 So.2d 1134, 1137 (Ala.2003) (citing Ocwen). Those circumstances include:
“ ‘(a) [W]hen a privilege is disregarded, see Ex parte Miltope Corp., 823 So.2d 640, 644-45 (Ala.2001); (b) when a discovery order compels the production of patently irrelevant or duplica-tive documents the production of which clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit received by the requesting party, see, e.g., Ex parte Compass Bank, 686 So.2d 1135, 1138 (Ala.1996); (c) when the trial court either imposes sanctions effectively precluding a decision on the merits or denies discovery going to a party’s entire action or defense so that, in either event, the outcome of the case has been all but determined and the petitioner would be merely going through the motions of a trial to obtain an appeal; or (d) when the trial court impermissibly prevents the petitioner from making a record on the discovery issue so that an appellate court cannot review the effect of the trial court’s alleged error. The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case — that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ'g Co., 601 So.2d 423, 426 (Ala.1992).’
“Dillard, 879 So.2d at 1137.”
Ex parte Guaranty Pest Control, Inc., 21 So.3d 1222, 1225-26 (Ala.2009). Thus, a petition for the writ of mandamus is a proper means by which to review the discovery order in these cases.

Discussion

In its petition, the IDB contends that the trial court exceeded its discretion in ordering (1) that the plaintiffs could depose Gallion; (2) that the deposition of Gallion could be recorded on video; and (3) that Gallion had to produce the documents the plaintiffs had requested in their notices of deposition.
“The Alabama Rules of Civil Procedure allow broad and liberal discovery.” Ex parte St. Vincent’s Hosp., 991 So.2d 200, 208 (Ala.2008) (citing Ex parte O’Neal, 713 So.2d 956, 959 (Ala.1998)). Rule 26(a), Ala. R. Civ. P., authorizes a party to obtain discovery in several ways, including “depositions upon oral examination.”[5] Rule *709 26(b)(1) permits discovery “regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.... ” Although the relevant information sought might not be admissible at trial, it is discoverable under Rule 26(b)(1) so long as it “appears reasonably calculated to lead to the discovery of admissible evidence.”
Rule 30(a), Ala. R. Civ. P., addresses depositions upon oral examination and states, in relevant part:
“After commencement of the action, any party may take the testimony of any person, including a party, by deposition upon oral examination. Leave of court, granted with or without notice, must be obtained only if the plaintiff seeks to take a deposition prior to the expiration of thirty (30) days after service of the summons and complaint upon any defendant or other mode of service under Rule 4, except that leave is not required (1) if a defendant has served a notice of taking deposition or otherwise sought discovery, or (2) if special notice is given as provided in subdivision (b)(2) of this rule.... ”
(Emphasis added.) On its face, therefore, the language of Rule 30 allows the taking of a deposition of any person, including opposing counsel.
Even so, under certain circumstances the trial court is required to limit a party’s use of the discovery methods permitted under Rule 26(a). In particular, Rule 26(b)(1) states:
“The frequency or extent of use of the discovery methods set forth in subdivision (a) shall be limited by the court if it determines: (i) that the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) that the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) that the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties’ resources, and the importance of the issues at stake in the litigation. The court may act upon its own initiative after reasonable notice or pursuant to a motion under subdivision (c).”
Rule 26(c) provides:
“Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition or production or inspection, the court in the circuit where the deposition or production or inspection is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a desig *710 nated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court. A motion for a protective order shall be accompanied by a statement of the attorney for the moving party stating that the attorney, before filing the motion, has endeavored to resolve the subject of the discovery motion through correspondence or discussions with opposing counsel or, if the opposing party is not represented by counsel, with the opposing party.”
Thus, the trial court is authorized, on its own initiative under Rule 26(b)(1) or on the motion of a party under Rule 26(c), to prevent the taking of a deposition that would otherwise be permitted under Rule 80. See In re Subpoena Issued to Friedman, 850 F.3d 65, 70 (2d Cir.2003) (“In other words, although a party seeking a deposition need not demonstrate the propriety of its request, judges may prevent the proposed deposition when the facts and circumstances are such that it creates an inappropriate burden or hardship.”).
Some courts have applied a heightened standard when a party is attempting to depose opposing counsel. Under this approach, the party seeking to depose opposing counsel has the initial burden of justifying its request before the deposition may proceed. The leading case exemplifying this approach is Shelton v. American Motors Corp., 805 F.2d 1323 (8th Cir.1986),[6] and the IDB in the present petition urges us to adopt the approach utilized in Shelton for instances in which a party seeks to depose opposing counsel.
In Shelton, the United States Court of Appeals for the Eighth Circuit held that the taking of opposing counsel’s deposition
“should be limited to [those circumstances] where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel ...; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.”
805 F.2d at 1327 (emphasis added).
In discussing Shelton, the United States Court of Appeals for the Second Circuit has observed:
“Shelton ... represents a departure from the otherwise permissive deposition-discovery regime under the Federal Rules of Civil Procedure. The Eighth Circuit summarized the specific policies that animated its heightened standard for depositions of opposing counsel as follows:
“‘Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney’s testimony. Finally, the practice of deposing opposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts to preparing the client’s case without fear of being interrogated by his or *711 her opponent. Moreover, the “chilling effect” that such practice will have on the truthful communications from the client to the attorney is obvious.’
“[805 F.2d] at 1327. Although the Shelton court did not explicitly rest this aspect of its holding on concerns about intruding on attorney-client privilege, such concerns were implicit in the court’s concern over a ‘chilling effect’ on attorney-client communications.
“The Eighth Circuit further explained the policies animating its Shelton decision in Pamida, Inc. v. E.S. Originals, Inc., 281 F.3d 726 (8th Cir.2002), and limited the Shelton rule’s reach. In Pa-mida, the plaintiff shoe retailer sued for indemnification from shoe manufacturers for the costs it incurred in the defense and settlement of a patent infringement lawsuit. The defendant shoe manufacturers sought to depose the attorneys who represented the plaintiff both in the indemnification action and the original patent lawsuit about whether the plaintiff had given adequate notice of its indemnity claim, as well as whether the fees the plaintiff sought were reasonably incurred in defending the patent infringement lawsuit. In permitting the depositions, the Eighth Circuit explained that Shelton ‘was intended to guard against the “harassing practice of deposing opposing counsel ... that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process.” ’ Id. at 729-30 (quoting Shelton, 805 F.2d at 1330). Such concerns were not implicated, according to the Eighth Circuit, when an attorney seeks only relevant information about prior terminated litigation:
“ ‘The Shelton test was intended] to protect against the ills of deposing opposing counsel in a pending case which could potentially lead to the disclosure of the attorney’s litigation strategy. Because this abuse of the discovery process had become an ever increasing practice, this Court erected the Shelton test as a barrier to protect trial attorneys from these depositions. But Shelton was not intended to provide heightened protection to attorneys who represented a client in a completed case and then also happened to represent that same client in a pending case where the information known only by the attorneys regarding the prior concluded case was crucial.’
“Id. at 730 (internal citations omitted). Accordingly, the court held that ‘[the defendant] need not satisfy Shelton to depose the [plaintiffs] attorneys regarding information involving the concluded patent infringement case,’ but that the proposed depositions were still subject to the standards of Rule 26. Id. at 730-31.”
Friedman, 350 F.3d at 70-71.
In Friedman, the Second Circuit declined to adopt the Shelton approach.[7] Instead, the court held that
“the standards set forth in Rule 26[, Fed.R.Civ.P.,] require a flexible ap *712 proach to lawyer depositions whereby the judicial officer supervising discovery takes into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship. Such considerations may include the need to depose the lawyer, the lawyer’s role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted. These factors may, in some circumstances, be especially appropriate to consider in determining whether interrogatories should be used at least initially and sometimes in lieu of a deposition. Under this approach, the fact that the proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but it is a circumstance to be considered.”
350 F.3d at 72.
As the Second Circuit observed in Friedman with respect to the Federal Rules of Civil Procedure, that part of Shelton that requires the party seeking to depose opposing counsel to justify its request for the deposition is a departure from the normal process under Rule 26, in which a party from whom discovery is sought must move for a protective order in compliance with Rule 26(c) before the party seeking discovery must justify its discovery request. See Friedman, 350 F.3d at 70 (“Shelton ... represents a departure from the otherwise permissive deposition-discovery regime under the Federal Rules of Civil Procedure.”). See also Rainbow Investors Group, Inc. v. Fuji Trucolor Missouri, Inc., 168 F.R.D. 34, 36 (W.D.La.1996) (“[T]he Federal Rules of Civil Procedure do not specifically prohibit taking the deposition of counsel.... Thus, the party seeking the protective order to preclude their attorney’s deposition bears the burden under Rule 26(c) of demonstrating good cause to preclude or limit the testimony.”). We therefore decline the IDB’s request to adopt the Shelton approach insofar as it requires the party seeking to depose opposing counsel to justify initially its need for the deposition. Rather, under Rule 26, Ala. R. Civ. P., the party seeking to prevent the deposition of its counsel has the burden of moving for a protective order and demonstrating “good cause” under Rule 26(c).
We think, however, that the Shelton factors are useful for evaluating a party’s motion for a protective order under Rule 26(c) seeking to prevent the deposition of its counsel. As noted above, Rule 26(b)(1) requires the trial court to limit “[t]he frequency or extent of use of the discovery methods set forth in subdivision (a)” if the court concludes
“(i) that the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) that the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) that the discovery is unduly burdensome or expensive, taking into account the needs of the ease, the amount in controversy, limitations on the parties’ resources, and the importance of the issues at stake in the litigation.”
In the unique context of a party’s attempt to prevent the deposition of its counsel, the Shelton factors are a practical means of implementing the requirements of Rule 26(b)(1) and evaluating whether there is good cause for the issuance of a protective order under Rule 26(c).
*713 Therefore, in support of its motion for a protective order to prevent the deposition of its counsel, the moving party may demonstrate “good cause” under Rule 26(c) by showing that one or more of the following circumstances exist: (1) that there are other means by which to obtain the information sought; (2) that the information sought is privileged or is not relevant; or (3) that the information sought is not crucial to the preparation of the case. Of course, the Shelton factors are not the exclusive means by which a party could show that good cause exists under Rule 26(c) for a protective order preventing the deposition of the party’s counsel. Similarly, the trial court is not required to consider only the Shelton factors in determining whether an attempt to depose opposing counsel presents one or more of the circumstances outlined in Rule 26(b)(1).
In moving for a protective order, the IDB argued that the information sought by Gallion’s deposition was available from other sources and that, therefore, the information was not crucial to the preparation of the plaintiffs’ cases. The IDB makes the same arguments in its petition to this Court as to the three specific areas identified in the trial court’s order permitting the deposition of Gallion as to his involvement in (1) the negotiation of the option agreements and the exercise of the options; (2) the negotiations relating to the project agreement; and (3) the closing of the “sale.”
As the IDB points out, there is evidence indicating Gallion’s involvement as to the actual purchase price paid under the option agreements, but there is no evidence indicating that Gallion was specifically involved in any other aspect of negotiating the option agreements. According to the IDB, Ellen McNair of the Montgomery Area Chamber of Commerce testified that Gallion was involved in negotiating the purchase price to be paid under the option agreements, but she also testified that Jerry Kyser of the Chamber of Commerce, Todd Strange, who was then the director of the Alabama Development Office, and John Walter Stowers of the IDB were involved in those same negotiations. Additionally, the landowners themselves have testified about the negotiations regarding the purchase price. Consequently, the IDB has demonstrated that there are means of obtaining information about the purchase price other than deposing Gal-lion.
The IDB also has shown that there are other means of obtaining information about the negotiation of the language of the option agreements. Jesse Williams, an attorney who represented a group of landowners, drafted those agreements. No evidence indicates that Gallion was involved in negotiating the language of or drafting the option agreements. In answers to interrogatories, the IDB asserted that it did not negotiate with the Russells or the McLemore group regarding the language of the option agreements, and George Russell, Myrtis Russell, Thomas Russell, Price McLemore, and Mary McLemore testified that they did not negotiate with anyone from the IDB regarding the language of the option agreements. There is evidence in the record from two members of the IDB as to their understanding of the most-favored-nation clause, and both Williams and Randall George have testified about the negotiations regarding the language of the option agreements and particularly the most-favored-nation clause.
The IDB also has demonstrated that information regarding the exercise of the options is available from other sources. The IDB points out that it is undisputed that the options were exercised on April 15, 2002. The IDB has produced letters from Gallion to the plaintiffs regarding the *714 exercise of the options, and the IDB has answered interrogatories from the plaintiffs as to why the options were exercised.
Similarly, the IDB has shown that information regarding the negotiations relating to the project agreement is available from other sources. The project agreement was drafted by Frank McPhillips of Maynard, Cooper & Gale, LLC, an attorney representing the State. McPhillips testified that the project agreement referred to the project site as including that property under option with the IDB and did not include the Shelton/Walker property. According to McPhillips, the Shelton/Walker property “had nothing to do with the project site. It was the rail yard site, and so it was treated separately.” McPhillips testified that a section addressing the Shelton/Walker property was included in the project agreement after negotiations with Hyundai’s attorneys in April 2002. McPhillips said he did not provide a draft of that section to the IDB because the IDB had made it clear that it would not provide any more money for the project.
Finally, the IDB has demonstrated that information regarding the closing is available from other sources besides Gallion. The IDB has produced all the closing documents. Additionally, the plaintiffs were present at the closing, and the IDB has answered several interrogatories about the closing.
In sum, the IDB argues that deposing Gallion is unnecessary because, it says, information regarding each of the areas as to which the trial court’s order compels Gallion’s deposition either is otherwise available to the plaintiffs or has already been obtained by the plaintiffs. Echoing the concerns expressed by the Eighth Circuit Court of Appeals in Shelton, the IDB contends that deposing Gallion would at best produce cumulative or duplicative information and at worst further disrupt the litigation and result in harassment, increased costs, and unnecessary delay. See Shelton, 805 F.2d at 1327 (“Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation.”); West Peninsular Title Co. v. Palm Beach County, 132 F.R.D. 301, 302 (S.D.Fla.1990) (“Federal courts, however, have held that depositions of attorneys inherently constitute an invitation to harass the attorney and parties, and to disrupt and delay the case.... Moreover, costs are added to litigation, burdens are placed upon attorneys, and the attorney client relationship is threatened.... These presumptions may constitute good cause for obtaining a protective order under Rule 26(a).”); and Cascone v. Niles Home for Children, 897 F.Supp. 1263, 1267 (W.D.Mo.1995) (“[A] party shouldn’t be able to use a deposition to sucker-punch the other side’s quarterback or listen in on the other side’s huddle.”). See also 6 Moore’s Federal Practice § 26.105[2][b](ii) at 26-527 (3d ed.2009):
“Most courts have recognized that deposing counsel tends to disrupt the adversarial system and add to the time and costs of litigation. It necessitates pretrial delays to resolve work-product and attorney-client objections. In addition, the practice of deposing counsel detracts from the quality of client representation because the relationship is tainted by the worry that counsel will be interrogated by the opponent.”
We agree with the IDB that the circumstances in the present cases implicate the same concerns that underlay the Shelton decision regarding the burdens and problems that typically accompany an attempt to depose opposing counsel. In doing so, we recognize that those concerns are perhaps not implicated to the same degree *715 here because these cases are not completely analogous to Shelton. For example, unlike Shelton, in which the deposition of opposing counsel sought only information the attorney had obtained in preparation for litigation, the IDB has not asserted specific ways in which it contends that the information sought is privileged.[8] However, we also are not persuaded that the present cases are analogous to Pamida, Inc. v. E.S. Originals, Inc., 281 F.3d 726 (8th Cir.2002), in which the United States Court of Appeals for the Eighth Circuit distinguished Shelton and permitted the deposition of opposing counsel regarding relevant information from the opposing counsel’s involvement in a prior, completed lawsuit. Unlike the scenario in Pamida, the plaintiffs here seek to depose Gallion about his involvement in the underlying transaction that forms the basis of the present lawsuits, not his involvement in a prior, completed lawsuit.
Under the circumstances of this case, once the IDB demonstrated that the information the plaintiffs sought to obtain by deposing Gallion is available from other sources, the burden then shifted to the plaintiffs to show that Gallion’s testimony was nonetheless crucial to the plaintiffs’ preparation of their case. The plaintiffs argue that Gallion’s testimony is crucial to their case because “Gallion was personally involved in the negotiations of the options, the project agreement, the relationship between all of the parties, and the closing of the options” and because “[n]o other person representing the IDB was able to provide any information from personal knowledge concerning this transaction.” (Answer, p. 24.) Ultimately, the plaintiffs contend that
“[t]he testimony from the IDB members and others involved, has been that Mr. Gallion was the person from the IDB that was involved in the negotiation of the options; that received notice that the Shelton/Walker property was part of the project; that was involved in the negotiation of the project agreement (which included the Shelton/Walker land and required the IDB to exercise the options to purchase the Plaintiffs’ property); that exercised the options to purchase the Plaintiffs’ property by the IDB; and that was involved in the closing of the property. Mr. Gallion is, therefore, a material and necessary witness to the entire transaction and is the only person from the IDB who can testify from personal knowledge. No one else has been able to do so, not even the IDB’s [Rule 30(b)(6), Ala. R. Civ. P.,] representative.”
(Answer, p. 28.)
In support of their position, the plaintiffs cite the deposition testimony of Berry Grant, who testified as the Rule 30(b)(6), Ala. R. Civ. P., representative for the IDB.[9] Specifically, the plaintiffs assert that *716 Grant “admitted that he had very little knowledge concerning the negotiations and the transaction” and that “the IDB depends on Mr. Gallion to keep them informed on transactions such as the transaction in this case.” (Answer, p. 25.)
' The testimony of Grant provided by the plaintiffs was as follows:
“Q. But many of the questions I asked of Mr. [Reuben] Thornton[, the chairman of the IDB,] he said he wasn’t able to answer that ... that things would be presented and he would sign them. So that’s why I’m trying to find somebody with the IDB who can answer specific questions and detailed questions about the involvement.
“A. You’re coming to the wrong person. Again, you’ve got to understand the context in which the [IDB] operates, the way we meet. We deal in legal documents, which I could read 10 times and couldn’t tell you three-fourths of what I read or what it meant, and that’s why we depend on counsel. That’s why our — -any project that comes before us requesting action, the very first thing we do is we want to know from our attorney if this is correct, if it’s something we can act on in the affirmative, if there are any problems with it. And that’s the way we operate.
“Q. And I’m understanding that and I’m hearing it from a lot of people.... But the Rules of Procedure allow me to depose somebody from the IDB who can answer specific questions.
“A. I will answer them as best I can given my memory.
“Q. Right. But as I gather from you, detailed questions about why a lease was entered into or why the option was assigned to the City or the County was not really a decision that would have been discussed or made by you and the other members of the board.
“A. It’s possible it would have been. Again, with [Gallion’s] consent.”
Other than asserting that it is so, the plaintiffs have not explained why Grant’s testimony demonstrates that Gallion’s testimony is crucial to the preparation of their case. As discussed above, there is no evidence indicating that Gallion was involved in negotiating any of the language of the option agreements.
The plaintiffs also cite the affidavit and deposition testimony of Reuben Thornton, the chairman of the IDB when the underlying actions were filed. Thornton’s affidavit described how representatives of the State of Alabama, Montgomery County, the City of Montgomery, the IDB, and the Montgomery Area Chamber of Commerce worked together to obtain land for the industrial project. The affidavit also described the IDB’s participation in the purchase of the land. However, the plaintiffs assert that
“when Mr. Thornton’s deposition was taken, he admitted that he had no personal knowledge of the statements contained in his affidavit^] indicating that his attorney, Mr. Gallion, was the person with the most knowledge concerning the transaction, that Mr. Gallion authored the Affidavit, and that he just signed it.”
(Answer, p. 25.)
In support of this assertion, the plaintiffs attached the following portion of Thornton’s deposition:
“Q. And your attorney drafted you up and advised to sign [the affidavit]; isn’t that true?
“MR. GALLION: Well, let me object to that. Again, there was a little bit more to it. We went over it, but ....
*717 “Q. Many of the things that we’ve gone over — and I really don’t want to go through paragraph by paragraph — but you would agree with me that statements that are made in your affidavit and your supplemental affidavit, you have no independent knowledge of that, do you?
“A. I guess that’s right. Yes.
“Q. I’m correct; right?
“MR. GALLION: Well, I object. As to some. Obviously, he has independent knowledge of what his name is and where in the hell he is.
“(Off the record discussion.)”
The affidavit of Thornton to which the plaintiffs refer is eight pages long and describes in detail how the various governmental representatives and entities worked together to obtain the land for the project. In the affidavit, Thornton asserts that he has “personal knowledge of all facts set forth in [the] affidavit.” Contrary to the plaintiffs’ assertion, we do not think the above-quoted portion of Thornton’s deposition demonstrates that Thornton “admitted that he had no personal knowledge of the statements contained in his affidavit.”
Finally, the plaintiffs assert that Ellen McNair, a member of the Montgomery Area Chamber of Commerce, “has testified that Mr. Gallion was involved during the initial negotiations with the landowners.” (Answer, p. 26.) The plaintiffs do not include a citation in support of that assertion, and they do not elaborate on the extent of Gallion’s alleged involvement during the initial negotiations with the landowners. As stated above, the IDB asserts that McNair testified that Gallion was involved only in the negotiation of the purchase price. Even if Gallion’s involvement in the “initial negotiations” extended beyond negotiating the purchase price, however, that does not necessarily establish that Gallion’s testimony is crucial to the plaintiffs’ cases.
In the portion of McNair’s deposition attached as an exhibit to the plaintiffs’ answer, McNair testified that she contacted Gallion and McPhillips on the night of Thursday, March 28, 2002, and told them that then Mayor Bright had “tak[en] out the option” on the Shelton/Walker property, and she testified that “Gallion ... would have known that there was an option on the Walker property before the project agreement was signed.” The plaintiffs also cite the following requests for admission, which were served on the IDB and which the IDB answered as “denied”:
“35. Admit that Thomas T. Gallion, III, the attorney for the IDB, knew that Hyundai was demanding that the Shelton/Walker property be purchased for use by Hyundai prior to the IDB signing the Project Agreement.
“36. Admit that Thomas T. Gallion, III, the attorney for the IDB, knew that an Option was signed by the Mayor of Montgomery for the purchase of the Shelton/Walker property prior to the IDB signing the Project Agreement.”
The plaintiffs contend that “[t]he only person [i.e., the only representative of the IDB] that would have personal knowledge concerning the notice provided by Mrs. McNair is Mr. Gallion.” (Answer, p. 28.) Clearly, however, McNair has testified about the notice she alleges was provided to Gallion; thus, the plaintiffs have obtained information about the alleged notice to Gallion. Although it may be that Gal-lion is the only representative of the IDB who “would have personal knowledge” of whether McNair provided the alleged notice, the plaintiffs’ cases seek to recover on a breach-of-contract claim. To establish that claim, the plaintiffs must prove (1) the *718 existence of a valid contract; (2) a breach by the defendants; (3) the plaintiffs’ own performance under the contract; and (4) damages. See State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293 (Ala.1999). The plaintiffs have not demonstrated that deposing Gallion about the notice McNair alleges she provided is crucial to the preparation of their claim seeking to recover for an alleged breach of contract.
Because the IDB has shown that Gallion is not the only source of information about each of the topics on which the plaintiffs sought to depose him and because the plaintiffs have not demonstrated that deposing Gallion is crucial to preparing their cases, the IDB is entitled to a protective order preventing the plaintiffs from deposing Gallion. Accordingly, we hold that the trial court exceeded its discretion in denying the IDB’s motion for a protective order to prevent the plaintiffs from deposing Gallion. We therefore grant the IDB’s petition for a writ of mandamus, and we direct the trial court to vacate its order denying the IDB’s motion for a protective order and to enter a new order granting the IDB’s motion for a protective order preventing the plaintiffs from deposing Gallion.[10]

Conclusion

The IDB’s petition for a writ of mandamus is granted.
PETITION GRANTED; WRIT ISSUED.
LYONS, WOODALL, STUART, BOLIN, and SHAW, JJ., concur.
MURDOCK, J., dissents.
COBB, C.J., recuses herself.

. The plaintiffs in the underlying actions are George E. Russell and Thomas E. Russell, as *701 coexecutors and cotrustees of the will and testamentary trust of Earnest W. Russell, and Myrtis Russell (case no. CV-04-3282), and Price McLemore, Mary H. McLemore, John Melnnis, Jr., Timothy N. Melnnis, Charles R. Melnnis, Williams S. Newell, and the Peoples Bank and Trust Company, as trustee for the Adaline Hooper Trust A and B (case no. CV-05-1728).

. As noted in McLemore, “[t]he provision 'the purchase price shall in no event be less than the price per acre paid to any other landowner included in the project planned for the Property' is known as a most-favored-nation clause or a price-escalation clause.” 7 So.3d at 322 n. 3.

. As noted in McLemore, “Echols was the project manage the Alabama Development Office for the Hyundai project.” 7 So.3d at 324 n. 5.

. Also on March 12, 2009, the IDB issued deposition notices for Frank Hawthorne and Randy Myers, the attorneys for the plaintiffs. On March 20, 2009, the plaintiffs moved for a protective order as to the notice of deposition issued to Hawthorne and Myers. The trial court ultimately denied the IDB's request to depose Hawthorne and Myers. In the present petition, the IDB does not challenge the trial court's denial of its request to depose Hawthorne and Myers.

. Rule 26(a), Ala. R. Civ. P., states: "Parties may obtain discovery by one or more of the following methods: depositions upon oral examination or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other pur *709 poses; physical and mental examinations; and requests for admission.”

. " 'Federal cases construing the Federal Rules of Civil Procedure are persuasive authority in construing the Alabama Rules of Civil Procedure, which were patterned after the Federal Rules of Civil Procedure.' " Ex parte Safeway Ins. Co. of Alabama, 990 So.2d 344, 349 n. 2 (Ala.2008) (quoting Hilb, Rogal & Hamilton Co. v. Beiersdoerfer, 989 So.2d 1045, 1056 n. 3 (Ala.2007)).

. The court stated that "only the Sixth Circuit has followed the Eighth in adopting the Shelton rule.” 350 F.3d at 71 (citing Nationwide Mut. Ins. Co. v. Home Ins. Co., 278 F.3d 621, 628 (6th Cir.2002)). Flowever, the court also noted that "[t]wo other circuits have upheld lower court rulings premised on Shelton by affirming on the grounds that the rulings were within the lower court’s discretion to manage discovery under Rule 26." 350 F.3d at 71 n. 3 (citing Boughton v. Cotter Corp., 65 F.3d 823, 830-31 (10th Cir.1995), and Nguyen v. Excel Corp., 197 F.3d 200, 208-09 (5th Cir.1999)).

. The IDB has made general allegations to that effect, such as the assertion that ”[a]ny testimony of Mr. Gallion about the negotiations also runs the risk of intruding on privileged matters.” (Petition, p. 27 (emphasis added).)

. The plaintiffs argue that Gallion has already agreed to be deposed, and the plaintiffs support that assertion with a selective quotation from a transcript of a hearing before the trial court in which Gallion stated:
"The question is .... do I have to submit to a deposition which I’ll tell you right now I will. He [the attorney for the plaintiffs] can ask those questions. I don’t give a hoot or heck if he videos it or brings in MGM studios, but I want to be able to ask him those questions I just told you.”
In its materials, the IDB provides additional pages from the transcript of that same hearing, and those pages clearly indicate that Gal-lion's statement that he was willing to be deposed was conditioned upon the plaintiffs' *716 attorneys also agreeing to be deposed. See supra note 4.

. Our holding that the IDB is entitled to a protective order preventing Gallion's deposition renders moot the IDB’s challenges to the trial court’s additional rulings that the deposition could be videotaped and that Gallion produce at the deposition the documents the plaintiffs requested in their notices of deposition.